962 A.2d 453

P.V., BY HER GUARDIANS AD LITEM T.V. AND L.V. AND T.V. AND L.V., INDIVIDUALLY, PLAINTIFFS–RESPONDENTS, v. CAMP JAYCEE, DEFENDANT–APPELLANT, AND "A" THROUGH "Z" DOE (FICTITIOUS NAMES ACTUAL NAMES BEING UNKNOWN), DEFENDANTS.

Argued February 19, 2008—Decided November 24, 2008.

134

*Walter F. Kawalec, III,* argued the cause for appellant (*Marshall, Dennehey, Warner, Coleman & Goggin,* attorneys).

*Philip G. Auerbach* argued the cause for respondents (*Lomurro, Davison, Eastman & Munoz,* attorneys).

Justice LONG delivered the opinion of the Court.

This choice-of-law case involves the question of whether New Jersey's charitable immunity statute, *N.J.S.A.* 2A:53A–7 to –11, applies to a tort committed in Pennsylvania. In 2003, a mentally disabled New Jersey resident was sexually abused at a summer camp located in Pennsylvania but operated by a New Jersey charity. Her parents sued the camp individually and on her behalf for negligent supervision at the campsite. The trial judge granted the camp's motion for summary judgment based on the doctrine of charitable immunity to which New Jersey adheres by statute. The Appellate Division reversed, declaring that Pennsylvania law governs the action because the commonwealth, which has abrogated charitable immunity and is the state in which the tortious conduct and injury occurred, has the greater governmental interest in the case. The camp filed a petition for certification that we granted.

Although we have traditionally denominated our conflicts approach as a flexible "governmental interest" analysis, we have

continuously resorted to the *Restatement (Second) of Conflict of Laws* (1971) in resolving conflict disputes arising out of tort. *See, e.g., Erny v. Estate of Merola,* 171 *N.J.* 86, 95–96, 792 *A.*2d 1208 (2002); *Fu v. Fu,* 160 *N.J.* 108, 119–39, 733 *A.*2d 1133 (1999). That approach is the "most significant relationship" test. Under that standard, the analysis in a personal injury case begins with the section 146 presumption that the local law of the state of the injury will apply. Once the presumptively applicable law is identified, that choice is tested against the contacts detailed in section 145 and the general principles outlined in section 6 of the Second Restatement. If another state has a more significant relationship to the parties or issues, the presumption will be overcome. If not, it will govern.

Examining the facts of this case as they relate to the contacts and principles articulated in the Second Restatement, we conclude that Pennsylvania, the state in which the charity chose to operate and which is the locus of the tortious conduct and injury, has at least as significant a relationship to the issues as New Jersey, and that the presumptive choice of Pennsylvania law therefore has not been overcome.

## I.

Over thirty years ago, New Jersey Camp Jaycee, Inc. (Camp Jaycee) was organized as a not-for-profit corporation to operate a summer program for mentally challenged individuals.[1] Although Camp Jaycee was incorporated in New Jersey and maintains an administrative office here, it has chosen to carry out its primary charitable mission in the Commonwealth of Pennsylvania at a campsite in the town of Effort.

In 2003, one of Camp Jaycee's campers was P.V., a twenty-one-year-old female from New Jersey with Down syndrome and mental and emotional handicaps. P.V. had attended the camp for

---

[1] The certificate of incorporation does not limit the organization to providing services to New Jersey residents.

at least three consecutive summers. According to the complaint, in August 2003, P.V. was sexually assaulted by another camper, as a result of which she sustained injuries requiring medical treatment.

P.V.'s parents, T.V. and L.V., as guardians *ad litem* and individually, instituted a personal injury action in New Jersey against Camp Jaycee and several fictitious defendants. They alleged that Camp Jaycee and its agents, servants, and employees were careless and negligent in the supervision of P.V. "at the camp" in Pennsylvania. Camp Jaycee filed a motion to dismiss, asserting immunity from suit under the New Jersey Charitable Immunity Act (CIA). *N.J.S.A.* 2A:53A-7 to -11.

The trial judge granted Camp Jaycee's motion for summary judgment on the ground that, under the CIA, the camp is immune from suit by a beneficiary. The Appellate Division reversed, declaring that the CIA is not the governing law of the case because Pennsylvania, the state of the wrongful conduct and injury, has abrogated charitable immunity and has a greater interest in regulating the conduct of entities operating within its borders than New Jersey has in immunizing not-for-profit corporations. *P.V. v. Camp Jaycee*, 393 *N.J.Super.* 19, 21–22, 922 *A.*2d 761 (App.Div.2007). In ruling, the Appellate Division relied in part on the exceptions that have been carved out of the CIA (e.g., the CIA does not immunize charities against actions for intentional conduct) as diluting New Jersey's interest. We granted Camp Jaycee's petition for certification, 192 *N.J.* 295, 927 *A.*2d 1293 (2007), and now affirm the judgment of the Appellate Division.

II.

Camp Jaycee argues that New Jersey has a transcendent interest in the application of its charitable immunity law because the camp was organized under the laws of New Jersey; both parties are domiciled in New Jersey; Pennsylvania has no interest in the post-event rights and liabilities of two New Jersey domicili-

aries; Pennsylvania is merely "the happenstance of the situs of the accident"; and no Pennsylvania citizen was injured.

P.V. counters that Pennsylvania, the state in which Camp Jaycee chose to operate; in which the tortious conduct and injury occurred; and in which the relationship of the parties was centered, has at least as great if not a greater interest than New Jersey in the resolution of this matter because of its concerns over conduct-regulation and redress to tort victims.

### III.

The background of our present approach to conflict of laws is helpful to this analysis. Traditionally, our courts, like those of most jurisdictions, followed the bright-line rules embodied in the *Restatement (First) of Conflict of Laws* (1934). Those rules applied the law of the jurisdiction where a right was said to have "vested." William L. Reynolds, *Legal Process and Choice of Law*, 56 *Md. L.Rev.* 1371, 1376 (1997).

> A tort right vested, for example, in the state where the injury occurred (rather than, say, where the wrongful conduct occurred); a contract right vested in the state where the last act necessary to make the contract took place (usually the acceptance), and so on. The system purported to solve all choice-of-law problems by isolating a key fact (such as where the plaintiff was injured); once the location of that fact is identified, the law to be applied follows ineluctably. On the surface, at least, the judge exercises no discretion; choosing applicable law is a routine, humdrum enterprise.
> [*Ibid.*]

Under that system, courts could choose between competing laws simply by applying concepts such as *lex fori, lex loci,* and *lex contractus,* without analyzing the content of the laws, the specific facts of a case, or the contacts the parties may have had with other states. That approach often resulted in the application of the law of a state with no real connection to the litigation and led to the downfall of the First Restatement. *Id.* at 1380–85.

During the 1950s, "legal realists" attacked the vested rights theory and countered that, in choosing between conflicting laws, courts should take into account the policies behind those laws and the facts of the cases that gave rise to the conflict. *Id.* at 1380

(citing Bruce Posnak, *Choice of Law: Interest Analysis and Its "New Crits"*, 36 *Am. J. Comp. L.* 681, 682 (1988) (noting early criticisms of First Restatement)).

In 1967, we joined with other jurisdictions in abandoning the First Restatement approach to tort cases, embracing the modern governmental interest analysis, for which Professor Brainerd Currie is generally credited.[2] *See Mellk v. Sarahson*, 49 *N.J.* 226, 234–35, 229 *A.*2d 625 (1967) (foregoing application of *lex loci* approach). The governmental interest test has traditionally been described as an approach by which courts seek to assess countervailing state laws through statutory construction and other interpretative mechanisms to determine whether the states' policies are aligned with either party in the litigation. Jeffrey M. Shaman, *The Vicissitudes of Choice of Law: The Restatement (First, Second) and Interest Analysis*, 45 *Buff. L.Rev.* 329, 349–50 (1997). *See generally* Brainerd Currie, *Selected Essays on the Conflict of Laws* 627 (1963). Under the governmental interest test, where an actual conflict exists, courts must "identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and the parties." *Veazey v. Doremus*, 103 *N.J.* 244, 248, 510 *A.*2d 1187 (1986).

Four years after our adoption of the governmental interest analysis, and seventeen years after the reform effort had been undertaken, the Second Restatement was finalized. To a great extent, it embraced the "reasoned elaboration" school of judicial analysis that requires a thorough explanation of every judicial decision, tied closely to the facts of the case, and an articulation of why the decision is just. Reynolds, *supra*, 56 *Md. L.Rev.* at 1387 (quoting Henry Hart, Jr. & Albert M. Sacks, *The Legal Process: Basic Problems in the Making and Application of Law* 145–52 (William Eskridge, Jr. & Philip P. Frickey eds., 1994)). In place

---

[2] By 2006, only ten states continued to adhere to the First Restatement for tort cases. Symeon C. Symeonides, *Choice of Law in the American Courts in 2006: Twenty–First Annual Survey*, 54 *Am. J. Comp. L.* 697, 712 (2006).

of black letter law, the Second Restatement contains presumptions and detailed considerations that bear on conflicts analyses. The philosophy underlying the Second Restatement has been described as follows:

> to provide guidance for judges by reminding them of things to consider in making a choice-of-law decision. The judge then would weigh the factors in light of the facts and explain why she reached the particular result. The listed factors certainly do not control the decision; rather, they merely suggest items upon which the judges should reflect. In other words, the Second Restatement provides judges with a starting point: a set of presumptions and a list of concerns worth addressing. It is then up to the judge to make it all work. The judge has to choose which law to apply, not which theory. Indeed, theory has relatively little to do with decision-making under the Second Restatement.

[*Id.* at 1388.]

Section 6, which has been described as the "cornerstone of the entire Restatement," Eugene F. Scoles et al., *Conflict of Laws* § 2.14 (4th ed.2004), prescribes that

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>
>> (a) the needs of the interstate and international systems,
>>
>> (b) the relevant policies of the forum,
>>
>> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>>
>> (d) the protection of justified expectations,
>>
>> (e) the basic policies underlying the particular field of law,
>>
>> (f) certainty, predictability, and uniformity of result, and
>>
>> (g) ease in determination and application of the law to be applied.

[*Restatement, supra,* § 6.]

The Second Restatement also provides specific guidance for resolving particular types of cases. *See, e.g., Restatement, supra,* ch. 8 ("Contracts"). In connection with tort, section 145 of chapter 7 is entitled "The General Principle" and prescribes that: "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." *Restatement,*

*supra*, § 145(1). The contacts that are weighed in making that assessment include:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.
>
> [*Restatement, supra*, § 145(2)(a)-(d).] [3]

Although the Second Restatement eschews the bright lines established by its predecessor, it does not abandon all rules:

> Once one ventures past section 145, however, the chapter dramatically changes character. Instead of infinitely open-ended sections, the Second Restatement, for the most part, articulates reasonably definite rules. To be sure, these succeeding sections contain escape valves that refer to section 6. Many of the rules echo the First Restatement's preference for choosing the law of the injury state. Others do not refer to the injury state directly, but choose connecting factors very likely, if not certain, to lead to the application of the law of the injury state.... Only a relatively few sections refer solely to the general formula of section 145 without providing some presumptive choice.
>
> [Patrick J. Borchers, *Courts and the Second Conflicts Restatement: Some Observations and an Empirical Note*, 56 *Md. L.Rev.* 1232, 1239–40 (1997) (footnotes omitted).]

In a personal injury case, the relevant presumption is contained in section 146, which provides:

> In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
>
> [*Restatement, supra*, § 146.]

As is evident, a pure governmental interest analysis is distinct from the Second Restatement approach. In the former, the strength of the countervailing governmental interests is dispositive. The latter

> does not focus solely on the state interests; instead, it directs courts to apply the law of the jurisdiction with "the most significant relationship" to the issue before

---

[3] Section 168, which provides specific guidance regarding charitable immunity, adheres to that analysis: "The law selected by application of the rule of § 145 determines issues of charitable immunity." *Restatement, supra*, § 168.

the court. In making this determination, the court is required to consider all of the contacts that each jurisdiction has with the issue.

[Earl M. Maltz, *Do Modern Theories of Conflict of Laws Work? The New Jersey Experience*, 36 *Rutgers L.J.* 527, 530 (2005) (footnotes omitted).]

In other words, "rather than the Second Restatement being intended to provide a metric for determining the strength of state interests, the respective strength of the states' interests is a factor to be considered in measuring the significance of the contacts of the relevant states." *Id.* at 546.[4]

Following the promulgation of the Second Restatement, we again modified our analysis, using the Second Restatement framework as our methodology in *Fu, supra,* 160 *N.J.* at 119–39, 733 *A.*2d 1133. Indeed, although dissenting on the merits, Justice Pollock explicitly declared what the majority had implicitly acknowledged by resorting to the Second Restatement: "New Jersey's governmental-interest test is substantially similar to the most-significant-relationship test adopted by the American Law Institute in *Restatement (Second) of Conflict of Laws* (the 'Restatement') (1971). Thus, New Jersey now adheres to the method of analysis set forth in *Restatement* sections 6 (Section 6) and 145 (Section 145)." 160 *N.J.* at 144, 733 *A.*2d 1133 (Pollock, J., dissenting).

More recently, in *Erny, supra,* this Court specifically cited the presumption in section 146 and also identified and applied the section 145 contacts and section 6 principles to resolve a choice-of-law issue. 171 *N.J.* at 95–97, 792 *A.*2d 1208. Although continuing to denominate our standard as a kind of governmental interest

---

[4] Our dissenting colleagues lament the loss of the "more nuanced" governmental interest approach. *Post* at 157–58, 962 *A.*2d at 468–69. The question is, more nuanced than what? It is certainly fair to suggest that the governmental interest analysis is more nuanced than its predecessor, the bright line *lex loci* test. However, as the Second Restatement itself underscores, the most significant relationship test embodies all of the elements of the governmental interest test plus a series of other factors deemed worthy of consideration. *Restatement, supra,* § 6(2)(b)-(c). As a matter of simple logic, the new end point—the most significant relationship test—is more and not less nuanced than its predecessor.

test, we now apply the Second Restatement's most significant relationship standard in tort cases. Under that standard, the law of the state of the injury is applicable unless another state has a more significant relationship to the parties and issues.

█ The Second Restatement assessment takes place on an issue-by-issue basis. *Id.* at 95, 792 *A.*2d 1208. It is qualitative, not quantitative. *Henry v. Richardson–Merrell, Inc.,* 508 *F.*2d 28, 32 (3d Cir.1975). In other words, the inquiry does not focus solely on the number of contacts with each state, although that can be persuasive. We also look to the principles in section 6 to measure the significance of the contacts in order to determine whether the presumption has been overcome. Viewed through the section 6 prism, the state with the strongest section 145 contacts will have the most significant relationship to the parties or issues, and thus its law will be applied.

### IV.

█ Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether " 'there is a distinction' " between them. *Lebegern v. Forman,* 471 *F.*3d 424, 430 (3d Cir.2006) (quoting *Grossman v. Club Med Sales, Inc.,* 273 *N.J.Super.* 42, 49, 640 *A.*2d 1194 (App.Div.1994)). If not, there is no choice-of-law issue to be resolved. *Rowe v. Hoffman–La Roche, Inc.,* 189 *N.J.* 615, 621, 917 *A.*2d 767 (2007); *Gantes v. Kason Corp.,* 145 *N.J.* 478, 484, 679 *A.*2d 106 (1996).

Here, it is clear, as the parties have conceded, that an actual conflict exists between the laws of Pennsylvania and New Jersey. By enacting the CIA, the New Jersey Legislature has carved charitable corporations out of its tort law system and declared them to be free from most tort liability. That statute provides:

No nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes or its trustees, directors, officers, employees, agents, servants, or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of

any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association. . . .

[*N.J.S.A.* 2A:53A-7(a).]

Contrary to New Jersey's policy of immunization, Pennsylvania has definitively abrogated its charitable immunity laws and has chosen to subject charitable corporations to the same tort liability as all others. *Flagiello v. Pa. Hosp.*, 417 *Pa.* 486, 208 *A.*2d 193, 207–08 (1965). Essentially then, the conflicting laws of New Jersey and Pennsylvania are two sides of the same coin—basically comprehending polar opposite positions regarding immunity from tort liability. If New Jersey law applies, the case will be dismissed. If Pennsylvania law applies, it will proceed. Because there is an evident conflict, we turn to the Restatement analysis.

## V.

Once a conflict is established, our point of departure is section 146, which, in this matter, presumes that Pennsylvania law (the local law of the state where the injury occurred) will govern the rights and liabilities of the parties. *See Erny, supra,* 171 *N.J.* at 95, 792 *A.*2d 1208 (commencing analysis from section 146 presumption). In that respect, Camp Jaycee makes a fundamental misstep in its analysis by misconceiving our turn away from the black letter law of *lex loci* as rendering the place of injury of little importance. Nothing could be further from the truth, as the presumption in section 146 underscores. Indeed, "the simple old rules can be glimpsed through modernity's fog, though spectrally thinned to presumptions." *Spinozzi v. ITT Sheraton Corp.*, 174 *F.*3d 842, 844 (7th Cir.1999).

Section 146 recognizes the intuitively correct principle that the state in which the injury occurs is likely to have the predominant, if not exclusive, relationship to the parties and issues in the litigation. *Restatement, supra,* § 146 comment d. It is from that vantage point that we turn to the remaining contacts set forth in sections 145 and the cornerstone principles of section 6 to determine whether New Jersey has "a more significant relationship . . .

[with] the occurrence and the parties" than Pennsylvania. *Restatement, supra,* § 146. Only such a finding would overcome the presumptive rule of section 146.[5]

## VI.

Under section 145, the first contact is the place where the injury occurred—Pennsylvania. Although Camp Jaycee characterizes the place of injury as Pennsylvania's only contact with the case, nothing could be further from the truth. Indeed, the second section 145 contact is the place where the conduct causing the injury occurred—that also is Pennsylvania. Despite our dissenting colleagues' contrary suggestion, the only allegation of negligence in the complaint is negligent supervision *at the Pennsylvania campsite.* In that respect,

> [w]hen both conduct and injury occur in a single jurisdiction, with only "rare exceptions, the local law of the state where conduct and injury occurred will be applied" to determine an actor's liability. That is so because "a state has an obvious interest in regulating the conduct of persons within its territory and in providing redress for injuries that occurred there." The place of injury becomes less important when it is simply fortuitous.
>
> [*Fu, supra,* 160 *N.J.* at 125–26, 733 *A.*2d 1133 (quoting *Restatement, supra,* § 145 comment d) (internal citations omitted).]

---

[5] That is the decisional rationale that.has been adopted by the majority of our sister jurisdictions that abide by the Second Restatement. *See, e.g., Townsend v. Sears, Roebuck & Co.,* 227 *Ill.*2d 147, 316 *Ill.Dec.* 505, 879 *N.E.*2d 893, 903–05 (2007); *Malena v. Marriott Int'l, Inc.,* 264 *Neb.* 759, 651 *N.W.*2d 850, 856–57 (2002); *McKinnon v. F.H. Morgan & Co., Inc.,* 170 *Vt.* 422, 750 *A.*2d 1026, 1028–29 (2000); *Morgan v. Biro Mfg. Co.,* 15 *Ohio St.*3d 339, 474 *N.E.*2d 286, 289 (1984). We recognize as we reaffirm our adherence to the most significant relationship test that the Second Restatement has, like its predecessor, come under criticism. *See, e.g.,* Douglas Laycock, *Equal Citizens of Equal and Territorial States: The Constitutional Foundations of Choice of Law,* 92 *Colum. L.Rev.* 249, 253 (1992) ("Trying to be all things to all people, it produced mush."); Shaman, *supra,* 45 *Buff. L.Rev.* at 361 ("Because the second Restatement tries to be so much and do so much, it is rife with inconsistency, incongruence, and incoherence."). Nevertheless, we believe that its exhaustive analytical framework is an advance over prior models and places us in company with the majority of our sister jurisdictions that have aligned themselves with a specific approach. Symeonides, *supra,* 54 *Am. J. Comp. L.* at 712 (identifying twenty-three states that have adopted the Second Restatement approach).

The place of the injury is fortuitous when "it bears little relation to the occurrence and the parties with respect to the particular issue." *Restatement, supra,* § 145 comment e (citing *Restatement, supra,* § 146 comments d-e). Here, the happening of the tortious conduct and injury in Pennsylvania was not a fortuity, as Camp Jaycee contends—Pennsylvania was the *only* location in which Camp Jaycee operated its camp for mentally disabled persons. It was a permanent fixture in that location. P.V. resided in Pennsylvania for at least three summers under the control of the camp. From that standpoint, Pennsylvania was not an unanticipated detour on the way to another location; it was the final destination. *See Fu, supra,* 160 *N.J.* at 137, 733 *A.*2d 1133 (citing *Reale v. Herco, Inc.,* 183 *A.D.*2d 163, 589 *N.Y.S.*2d 502, 508 (1992) (noting infant plaintiff's decision to vacation at Hershey Park had direct and substantial nexus with Pennsylvania)).

The third contact is "the domicil, residence, nationality, place of incorporation and place of business of the parties." *Restatement, supra,* § 145(2)(c). To be sure, P.V. is a New Jersey domiciliary, and Camp Jaycee is a New Jersey not-for-profit corporation. However, P.V. chose to attend the camp in Pennsylvania. Moreover, as the Second Restatement underscores, the use of the term "domiciliary" when referring to corporations is imprecise. *See id.* § 145 comment e. Courts should focus not only on an entity's place of incorporation but also on its principal place of business. *Ibid.* Indeed, in balancing those two epicenters, "[a]t least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter place." *Ibid.*

In this case, Camp Jaycee was incorporated for the primary purpose of running a camp for mentally disabled children and adults. As far as this record reveals, Camp Jaycee has chosen to perform that function solely in Effort, Pennsylvania, and, although it does maintain an administrative office in New Jersey, the

principal place of the business *for which it was incorporated* is Pennsylvania.

The final section 145 contact is the place where the relationship between the parties is centered. Even if P.V. signed on as a camper through Camp Jaycee's administrative office in New Jersey (and the record is silent on that issue), it is of little consequence because this is not a contracts case. Rather, it is a tort action and, from that perspective, there is no question that P.V.'s relationship with Camp Jaycee was centered on her camp experience in Effort, Pennsylvania.

In sum, on one side of the contacts ledger, P.V. and Camp Jaycee are co-domiciliaries of New Jersey. On the other side of the ledger, Camp Jaycee chose to perform the sole charitable function for which it was organized in Pennsylvania; P.V. chose to attend a camp in Pennsylvania; the relationship between P.V. and Camp Jaycee was centered on the camp experience in Pennsylvania; the tortious conduct (negligent supervision) took place solely in Pennsylvania; and P.V. was injured in Pennsylvania.

Standing alone, New Jersey's contacts are certainly no greater than those of Pennsylvania. However, because our analysis is not merely quantitative, we also look to the principles of section 6 to measure the significance of those contacts. In other words, do the section 6 considerations gin up or diminish the values to be ascribed to the contacts relative to the issue presented?

## VII.

Reduced to their essence, the section 6 principles are: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Erny, supra,* 171 *N.J.* at 101–02, 792 *A.2d* 1208 (quoting *Fu, supra,* 160 *N.J.* at 122, 733 *A.2d* 1133).

## A.

■ The competing interests of the states and relevant tort law principles overlap in this case. Both Pennsylvania and New Jersey have established tort law systems intended to compensate tort victims and deter wrong-doing. However, from that scheme, New Jersey has carved out charitable corporations and declared them to be free from most tort liability. The Legislature has determined that the proper way to encourage charity in New Jersey and to guarantee continuance of the good works charities provide is to insure they will not have to expend their resources on litigation. "[T]he essence of the public policy favoring charitable immunity is the preservation of private charitable contributions for their designated purposes." *Bieker v. Cmty. House of Moorestown,* 169 *N.J.* 167, 178, 777 *A.*2d 37 (2001) (quoting *Parker v. St. Stephen's Urban Dev. Corp., Inc.,* 243 *N.J.Super.* 317, 326, 579 *A.*2d 360 (App.Div.1990)).

■ As previous rulings have declared, New Jersey's public policy in enacting the CIA is "strong" and is to be "considered remedial and be liberally construed." *Monaghan v. Holy Trinity Church,* 275 *N.J.Super.* 594, 598, 646 *A.*2d 1130 (App.Div.1994). Although there are exceptions to the immunity provided,[6] those exceptions do not, in any measure, water down the importance of the policy to our state, and to the extent that the Appellate Division suggested otherwise, it was wide of the mark. In any event, our focus is not on the importance of the policy to the state but on the relationship between the policy and the contacts.

Pennsylvania, on the other hand, has explicitly rejected the policy of charitable immunity. *Flagiello, supra,* 208 *A.*2d at 207–08. It is the characterization of Pennsylvania's policy that is at

---

[6] The Charitable Immunity Act does not apply to "aggravated wrongful conduct, such as malice or fraud, or intentional, reckless and wanton, or even grossly negligent behavior." *Hardwicke v. Am. Boychoir Sch.,* 188 *N.J.* 69, 97, 902 *A.*2d 900 (2006) (quoting *Schultz v. Roman Catholic Archdiocese of Newark,* 95 *N.J.* 530, 542, 472 *A.*2d 531 (1984) (Handler, J., dissenting)).

issue in this case. Camp Jaycee denominates Pennsylvania's abrogation of charitable immunity as nothing more than a post-event loss-allocation construct, which it argues renders the conduct-related contacts in Pennsylvania essentially irrelevant. In framing the issue that way, Camp Jaycee suggests that Pennsylvania's interest will not be impaired if we apply New Jersey law to bar the suit of a New Jersey citizen.

It is not surprising that, in support of that view, Camp Jaycee has relied on the decision in *Schultz v. Boy Scouts of America, Inc.*, 65 *N.Y.*2d 189, 491 *N.Y.S.*2d 90, 480 *N.E.*2d 679 (1985). There, two members of a New Jersey Boy Scout troop were sexually abused by their scoutmaster on an outing in New York. *Id.* 491 *N.Y.S.*2d 90, 480 *N.E.*2d at 681. Their parents sued in New York, and the Court of Appeals of New York held the suit barred by the New Jersey doctrine of charitable immunity to which New York does not subscribe. *Ibid.* In ruling, the Court characterized New York's abrogation of charitable immunity as a loss-allocation measure. *Id.* 491 *N.Y.S.*2d 90, 480 *N.E.*2d at 686. It concluded that New York, the place of the conduct and injury, had no true interest in the outcome because the victims and defendant were New Jersey residents, thus making New Jersey the state with the preeminent interest—immunity. *Id.* 491 *N.Y.S.*2d 90, 480 *N.E.*2d at 688–89.

The dissenting judge disagreed with that characterization:

There can be no question that this State has a paramount interest in preventing and protecting against injurious misconduct within its borders. This interest is particularly vital and compelling where, as here, the tortious misconduct involves sexual abuse and exploitation of children, regardless of the residency of the victims and the tort-feasors. (*See, New York v. Ferber,* 458 *U.S.* 747, 756–60, 102 *S.Ct.* 3348, 3354–3356, 73 *L.Ed.*2d 1113, *on remand* 57 *N.Y.*2d 256, 455 *N.Y.S.*2d 582, 441 *N.E.*2d 1100.) Despite the majority's denial, New York's law in question is intimately connected to this overriding interest.

. . . .

Indeed, this deterrence function of tort law, whether it be in the form of imposing liability or denying immunity, is a substantial interest of the locus state which is almost universally acknowledged by both commentators and the courts to be a prominent factor deserving significant consideration in the resolution of conflicts problems.

150

[*Schultz, supra,* 491 *N.Y.S.*2d 90, 480 *N.E.*2d at 691–92.] 7

That is our conclusion as well. The proper characterization of Pennsylvania's policy is that it is a measure limned for the purpose of "prevent[ion], protect[ion] and compensat[ion]." *Id.* 491 *N.Y.S.*2d 90, 480 *N.E.*2d at 691. Indeed, when a state decides to abrogate its charitable immunity law, it typically does so with the intention of insuring due care: "[I]t both assures payment of an obligation to the person injured and gives warning that justice and the law demand the exercise of care." *Bing v. Thunig,* 2 *N.Y.*2d 656, 163 *N.Y.S.*2d 3, 143 *N.E.*2d 3, 8 (1957). In *Flagiello,* the Pennsylvania Supreme Court used strong language to describe its conduct-regulating interest in abolishing charitable immunity:

Human nature being what it is, administrators of a hospital, cognizant that the hospital is insulated from tort liability, may be less likely to exercise maximum scrutiny in selecting personnel than if the hospital were held monetarily liable for slipshod, indifferent, and neglectful conduct of employees. As Justice Rutledge said in the *Georgetown* case, [*President and Directors of Georgetown College v. Hughes,* 130 *F.*2d 810, 824 (D.C.Cir.1942),] "immunity tends to foster neglect while liability tends to induce care and caution."

[*Flagiello, supra,* 208 *A.*2d at 202; *see also Molitor v. Kaneland Cmty. Unit Dist. No. 302,* 18 *Ill.*2d 11, 163 *N.E.*2d 89, 95 (1959) ("[W]e believe that abolition of such immunity may tend to decrease the frequency of school bus accidents . . . ."), *superseded by statute,* 745 *ILCS* 10/1–101 to 10–101, *as recognized in Harrison v. Hardin County Cmty. Unit Sch. Dist. No. 1,* 197 *Ill.*2d 466, 259 *Ill.Dec.* 440, 758 *N.E.*2d 848, 851 (2001); *Silva v. Providence Hosp. of Oakland,* 14 *Cal.*2d 762, 97 *P.*2d 798, 802, 805 (1939) (holding a nonprofit hospital liable to an injured party because "[California] should not be added to the list of those whose courts have encouraged—as in some degree they surely have—the agents of charitable institutions to render less than due care for the security of life, limb, and property, the very things which it is the sole purpose of such institutions to preserve and protect.").]

---

7 Most conflicts scholars are in accord with the dissent. The majority opinion in *Schultz* has been excoriated by conflicts scholars of every stripe as "awful," "perfidious," "troubling," "perverse," "nonsensical," "irrational," and in line with New York's "own bad record in choice of law cases." *See* Patrick J. Borchers, *Conflicts Pragmatism,* 56 *Alb. L.Rev.* 883, 910–11 (1993); Alan Reed, *The Anglo–American Revolution in Tort Choice of Law Principles: Paradigm Shift or Pandora's Box?,* 18 *Ariz. J. Int'l & Comp. L.* 867, 887 (2001); Reynolds, *supra,* 56 *Md. L.Rev.* at 1408–11 (1997); Aaron D. Twerski, *A Sheep in Wolf's Clothing: Territorialism in the Guise of Interest Analysis in Cooney v. Osgood Machinery, Inc.,* 59 *Brook. L.Rev.* 1351, 1358–59 (1994).

Our dissenting colleagues' suggestion that the heart of *Flagiello* was the transformation of hospitals into "big business" and the protection of Pennsylvania residents says too little. *Post* at 173–74, 962 *A.*2d at 478–79. *Flagiello* devoted equal, if not more, attention to the notion that every wrong has a remedy and the paradoxical and unjust results generally produced by the charitable immunity doctrine. *Id.* at 195, 197, 203, 204–05.

Moreover, the Pennsylvania Supreme Court has since extended *Flagiello* to include torts occurring to non-paying patients in hospitals, *Siewicz v. Wyo. Valley Hosp.,* 417 *Pa.* 533, 208 *A.*2d 238, 238 (1965), and torts on property owned by religious organizations, *Nolan v. Tifereth Israel Synagogue of Mount Carmel, Pa. Inc.,* 425 *Pa.* 106, 227 *A.*2d 675, 676–77 (1967).

Additionally, in its ruling, the court in *Flagiello* never referred specifically to Pennsylvania residents but to patients generally. 208 *A.*2d at 195, 197, 203, 204–05. In fact, the court approvingly quoted Judge Fuld's prophetic statement in *Bing* that

[i]t is not too much to expect that those who serve and minister to members of the public should do so, as do all others, subject to that principle and within the obligation not to injure through carelessness. It is not alone good morals but sound law that individuals and organizations should be just before they are generous.

[*Bing, supra,* 163 *N.Y.S.*2d 3, 143 *N.E.*2d at 8.]

Essentially then, there are two conflicting policies at issue here—New Jersey's post-event loss-allocation policy and Pennsylvania's conduct-regulation and redress policy. The question is how those policies relate to the relevant contacts.

We conclude that, in the main, the policies are aligned with Pennsylvania's contacts. As we previously stated, the fact that the conduct and injury occurred in Pennsylvania was not fortuitous. Camp Jaycee has a continuous and deliberate presence in Pennsylvania. The camp is tasked with the responsibility of supervising and caring for mentally disabled campers for extended periods of time within the commonwealth. It is that perennial presence and activity in Pennsylvania that is inextricably intertwined with Pennsylvania's interest in conduct-regulation. If

Pennsylvania's tort law is to have any deterrent impact and protect other campers from the type of harm inflicted upon P.V., it must be applied in situations where tort-feasors repeatedly perform their tasks within the state, regardless of the home state of the campers. Indeed, there is no way for a state to "make its territory safe for residents without making it safe for visitors too. If it is unsafe for visitors it is unsafe for residents." Louise Weinberg, *Against Comity*, 80 *Geo. L.J.* 53, 89 (1991).[8]

Concededly, New Jersey's interest in protecting its charitable corporations is aligned with the parties' co-domiciliary status in this state. However, where, as here, the plaintiff chooses to attend camp and the corporation opts to perform its primary charitable acts outside the state, the strength of that contact is diluted. Indeed, immunity laws are designed to encourage persons to engage in the particular conduct within the state. Where defendant's conduct takes place in another state, the immunity goals are diminished. *Restatement, supra,* § 146 comment e.

## B.

The interest of interstate comity seeks to "further harmonious relations between the states and to facilitate commercial intercourse between them." *Restatement, supra,* § 6 comment d. It considers "whether application of a competing state's law would frustrate the policies of other interested states." *Fu, supra,* 160 *N.J.* at 122, 733 *A.*2d 1133. Affording immunity for the negligence committed by Camp Jaycee in Pennsylvania would significantly frustrate Pennsylvania's purpose in deterring tortious conduct within the commonwealth. *Cf. id.* at 137, 733 *A.*2d 1133 ("New York 'has an obvious interest in regulating the conduct of persons

---

[8] We note that, on the merits, this case is entirely distinct from *Schultz* insofar as the Boy Scout troop in *Schultz* was chartered in New Jersey and the assault took place on an outing to New York. 491 *N.Y.S.*2d 90, 480 *N.E.*2d at 681. In fact, some assaults in *Schultz* also took place in New Jersey. *Ibid.* Here, the camp was a fixture in Pennsylvania and the assaults and the injury occurred there.

within its territory and in providing redress for injuries that occurred there.'" (citation omitted)); *see also Erny, supra,* 171 *N.J.* at 108, 792 *A.*2d 1208 (applying New York law "[b]ecause the policy underlying New Jersey's law is not thwarted by application of New York ... law to this case, and because the compensation and deterrence policies underlying New York's law are advanced.").

Although we have departed from the rigid application of the *lexi loci* approach, we have continuously deferred to the rights of other jurisdictions to regulate conduct within their borders. That is particularly so when the conduct is ongoing and directed towards residents and non-residents alike.

New Jersey can continue to protect charities operating in this state even if the law of Pennsylvania is applied to the Pennsylvania activities in this case. The converse is not true. If New Jersey's immunity law is applied, Pennsylvania's ability to regulate the conduct of those who chose to operate within its borders will be substantially impaired. *See, e.g., Mellk, supra,* 49 *N.J.* at 230, 229 *A.*2d 625 ("In the present case the State of Ohio has a real interest in having its rules of the road apply to the conduct of the parties in the operating of a motor vehicle on the highways of that state. Under principles of comity the courts of New Jersey will recognize and follow the Ohio laws relating to traffic safety."); *Fu, supra,* 160 *N.J.* at 129, 733 *A.*2d 1133 (citing *Bray v. Cox,* 39 *A.D.*2d 299, 333 *N.Y.S.*2d 783, 785–86 (1972)) (applying New York's law despite both parties being domiciled in New Jersey in recognition that "New York has strong governmental interests in applying Section 388 to an accident within its borders even when none of the parties is a New York resident").

## C.

In respect of the parties' expectations, Camp Jaycee argues that the parties' co-domiciliary status in New Jersey gave it a reasonable belief that it would be immune under the CIA and that P.V. should have been aware of that immunity. In other words, it

organized in New Jersey so it would not have to respond in tort for its wrongful actions toward beneficiaries, and P.V. understood that protection. That view overlooks the reality of this case: Camp Jaycee operates its camp in Pennsylvania; P.V. chose to attend the camp in Pennsylvania; there is nothing in the camp's certificate of incorporation to suggest that it is limited to New Jersey residents; P.V. was sexually assaulted at the camp in Pennsylvania; and this lawsuit alleges carelessness and negligence *at the camp.* In *Fu, supra,* we dismissed the notion that a corporation could reasonably expect automatic immunization when conducting affairs outside the state: "[H]owever reasonable may be a rental agency's reliance on New Jersey's vicarious liability laws for purposes of an accident in this State, any blanket reliance on this State's law as a defense to conduct occurring in a foreign jurisdiction could not be justified." 160 *N.J.* at 135, 733 *A.*2d 1133. Thus, although the parties legitimately might have expected that Camp Jaycee's activities *in New Jersey* were immune under the CIA, they should not have expected it to carry that immunity into another state.

### D.

The interests of judicial administration require courts to consider issues such as practicality and ease of application, factors that in turn further the values of uniformity and predictability. *Erny, supra,* 171 *N.J.* at 102, 792 *A.*2d 1208; *Fu, supra,* 160 *N.J.* at 124, 733 *A.*2d 1133. As the Second Restatement points out, the section 146 presumption in favor of the law of the state of the injury, in itself, "furthers the choice-of-law values of certainty, predictability and uniformity of result and, since the state where the injury occurred will usually be readily ascertainable, of ease in the determination and application of the applicable law." *Restatement, supra,* § 146 comment c. Moreover, where, as here, the contacts and principles of the Second Restatement lead inexorably to the conclusion that a particular state's relationship to the parties and issues is predominant, judicial administration consider-

ations necessarily yield. *Erny, supra,* 171 *N.J.* at 102, 792 *A.*2d 1208 (citing *Fu, supra,* 160 *N.J.* at 124, 733 *A.*2d 1133). *See generally* Symeon C. Symeonides, *The Need for a Third Conflicts Restatement (And a Proposal for Tort Conflicts),* 75 *Ind. L.J.* 437, 462 (2000) (recognizing ease-of-application consideration must yield to judicious results in fact-patterns analogous to present case).

## VIII.

In sum, in balancing the relevant elements of the most significant relationship test, we seek to apply the law of the state that has the strongest connection to the case. As we have said, in a personal injury action, the analysis begins with section 146 of the Second Restatement, which presumes that the local law of the state of injury will be applied. If the presumptive rule points to a specific jurisdiction, the court will look to the remaining contacts in section 145 and the principles embodied in section 6 of the Restatement to determine whether another state has a more significant relationship to the parties or issues. In that case, the presumption will be overcome; otherwise, the presumption will govern.

Here, under section 146, the law of Pennsylvania is presumptively applicable because it is the state of injury. In addition, it is the state in which P.V. chose to attend camp; in which Camp Jaycee chose to carry out its charitable function; in which the tortious conduct occurred; and in which the parties' relationship was centered. On the other side of the contacts ledger, P.V. and Camp Jaycee are New Jersey domiciliaries. Thus, both jurisdictions bear a relationship to the case.

On a purely quantitative level, Pennsylvania's contacts substantially outweigh those of New Jersey, suggesting that it is the state with the most significant relationship to the parties and issue. Nevertheless, we have looked to section 6 to determine whether more or less weight should be ascribed to those contacts, thus

altering the balance and warranting an override of the section 146 presumption.

Our conclusion is that the presumption has not been overcome. Although both states have strong countervailing policies regarding immunity, Pennsylvania's policy of conduct-regulation and recompense is deeply intertwined with the various Pennsylvania contacts in the case. On the contrary, New Jersey's loss-allocation policy does not warrant the assignment of priority to the parties' domicile in New Jersey in connection with activities outside the state's borders.

The comity considerations likewise favor the Pennsylvania contacts because the application of Pennsylvania law would not thwart New Jersey's interest in protecting charitable activities in this state, whereas the application of New Jersey law would necessarily subvert Pennsylvania's interest in deterrence and recompense. Further, the parties could not have expected New Jersey immunity to apply to the camp's out-of-state activities. Finally, no judicial administration interest is implicated here.

In short, neither the contacts themselves nor the section 6 considerations support the conclusion that New Jersey has a more significant relationship to the case than Pennsylvania. In fact, the converse is true. Although we recognize the vitality of our own policy of immunizing charities, in this case, it must yield to the presumption favoring application of Pennsylvania law, which has not been overcome.

## IX.

The judgment of the Appellate Division is affirmed. The case is remanded to the trial judge for further proceedings consistent with the principles to which we have adverted.

Justice HOENS, dissenting.

Today, a majority of this Court has chosen to adopt a new framework for deciding conflict of law disputes. Although stating

that there is nothing novel in its approach, and although support-
ing that assertion with citations to parts of this Court's prior
opinions (both majorities and dissents) as proof that this Court has
long used the analytical model embodied in the. *Restatement
(Second) of Conflict of Laws* (1971), in reality, the majority has
substituted that test for our traditional one. At the same time,
the majority has tossed aside our far more nuanced "governmental
interest" approach, in which the factors identified by the *Restate-
ment (Second)* were but an occasionally useful guide, and em-
braced in its place the *Restatement (Second)'s* "most-significant-
relationship" test.

In doing so, the majority ignores the important differences
between the two approaches, overlooks the essential focus of our
traditional test, and misapplies the factors embodied in the *Re-
statement (Second)*. At the same time, the majority has selected
a test that has been criticized, by some of the same authorities [1]
that the majority cites for its separate purposes, as results orient-
ed.

More to the point, in the process of adopting a new test more or
less sub silentio, the majority ignores the remarkably strong
interest that our Legislature has expressed about charitable im-
munity and substitutes the alternate view of a court in Pennsylva-
nia that mirrors the approach this Court long ago attempted to
embrace as more "enlightened." Sadly, when the facts and issues
are analyzed by weighing the competing interests of the two states
in accordance with our traditional governmental interest approach,
or even in accordance with that approach as informed by the
*Restatement (Second)*, this plainly sympathetic plaintiff has no

---

[1] *See, e.g.,* William L. Reynolds, *The Silver Anniversary of the Second Conflicts
Restatement: Legal Process and Choice of Law,* 56 *Md. L.Rev.* 1371, 1388 (1997)
("criticiz[ing] the Second Restatement for its lack of a system and ... conse-
quential invitation to open-ended or indeterminate decisionmaking"); Patrick J.
Borchers, *Conflicts Pragmatism,* 56 *Alb. L.Rev.* 883, 901–02 (1993) (describing
effort of one academic to "convince the West Virginia Supreme Court to
[embrace the Second Restatement] ... largely on the grounds that [it] has so
much wiggle room").

avenue for relief. In adopting a new test, and in applying a test that provides a mechanism for relief, however, the majority creates consequences here in our State which our Legislature has repeatedly sought to prevent.

Because I cannot join in what I see as a majority of the Court substituting its view of an appropriate public policy for the public policy choice explicitly announced by our Legislature, I respectfully dissent.

I.

The majority traces the history of choice of law principles with a focus on its development in terms largely external to our own jurisprudence. To be sure, our method of analysis has not evolved in a vacuum. Instead, our analytical framework has changed both in tandem with and, at times, in stark divergence from, the path forged by the academics who seek to shape our thinking. There is no need to retrace the entirety of the development of this body of law either here in New Jersey or as it has been described in the scholarly literature. There is, however, a need to make plain the differences between our traditional analysis and the test set forth by the majority.

We abandoned the simplistic lex locus analysis of the first *Restatement of Conflict of Laws*,[2] in favor of the more flexible governmental interest analysis because the "place of the wrong" test often led to harsh and unacceptable results. *See Veazey v. Doremus*, 103 *N.J.* 244, 247, 510 *A.*2d 1187 (1986) (citing *Mellk v.*

---

[2] One recent commentator has lamented the movement of courts away from the "clear, plausible answers" that the lex locus approach yielded, describing the more modern theories as "the destruction of rationality." Earl M. Maltz, *Do Modern Theories of Conflict of Laws Work? The New Jersey Experience*, 36 *Rutgers L.J.* 527, 527 (2005). Although much might be said about the confusion that the various theories offered by commentators over the years has created for many courts, we need only comment on the unfair outcomes that the previous rigidity created to explain our preference for the more modern approach that we have adopted.

*Sarahson,* 49 *N.J.* 226, 228–29, 229 *A.*2d 625 (1967)). We therefore elected to abandon a rule that provided certainty, uniformity, and predictability, in favor of one that, in spite of its complexities, we were confident would be both fair to all of the litigants and faithful to the public policy of this State. *Ibid.*

The governmental interest analysis contemplates a two-step approach. In its traditional articulation, the court first determines whether there is a conflict between the laws of the various jurisdictions that have an interest in the matter. If a conflict of laws is found, the court then "identif[ies] the governmental policies underlying the law of each state" and determines "how those policies [were] affected by each state's contacts to the litigation and to the parties." *Veazey, supra,* 103 *N.J.* at 248, 510 *A.*2d 1187. After engaging in these two steps, the court must then "apply the law of the state with the greatest interest in governing the specific issue in the underlying litigation." *Fu v. Fu,* 160 *N.J.* 108, 118, 733 *A.*2d 1133 (1999). That is, if an actual conflict exists, the second step "seeks to determine the interest that each state has in resolving the specific issue in dispute." *Gantes v. Kason Corp.,* 145 *N.J.* 478, 485, 679 *A.*2d 106 (1996). That requires the court to identify the governmental policies underlying the law of each state and determine whether "those policies are affected by each state's contacts to the litigation and to the parties." *Veazey, supra,* 103 *N.J.* at 248, 510 *A.*2d 1187; *see Rowe v. Hoffman–La Roche,* 189 *N.J.* 615, 621–22, 917 *A.*2d 767 (2007).

In 1999, however, we were confronted with the need to balance the "well articulated" public policy underlying a New York statute against the difficult to discern public policy bases for the common law pronouncements of this State's courts. *See Fu, supra,* 160 *N.J.* at 117, 733 *A.*2d 1133. It was only in that context that we turned to the factors set forth in the *Restatement (Second),* resorting to them only because they were helpful in identifying the relevant public policies and interests and, therefore, useful in performing our governmental interest analysis. *Id.* at 119–35, 733 *A.*2d 1133. In particular, we looked to a variety of factors drawn

from sections 6 and 145 of the *Restatement (Second)*, describing those factors as "guides." *Id.* at 119, 733 *A.2d* 1133.

Similarly, in *Erny v. Merola*, 171 *N.J.* 86, 792 *A.2d* 1208 (2002), we found the *Restatement (Second)* factors to be a useful tool. There we considered conflicting statutes of this State and New York, which included clear expressions of policy, but did not on initial review lend themselves to the proper application of the governmental interest analysis. We therefore turned again to the *Restatement (Second)* factors, concluding that they were helpful in identifying the interests that the application of each statute would serve. *Erny, supra,* 171 *N.J.* at 94, 792 *A.2d* 1208. Neither in *Fu* nor in *Erny* did we abandon the governmental interest analysis in favor of a wholesale embrace of the *Restatement (Second)* test. Indeed, suggesting, as the majority does, *see ante* at 142–43, 962 *A.2d* at 460, that in *Erny* we applied only the *Restatement (Second)* test is simply inaccurate; the governmental interest analysis pervades that opinion and fully supports its conclusion. That we have not abandoned the governmental interest analysis for the *Restatement (Second)* framework could not be plainer than a cursory reading of *Rowe,* our most recent choice of law decision. Although that decision is largely overlooked by the majority, we there found resort to the guidance afforded by the *Restatement (Second)* to be unnecessary. *See Rowe, supra,* 189 *N.J.* at 622, 917 *A.2d* 767.

Nor is the governmental interest test the same kind of an inquiry as the most significant relationship test. Merely putting the names of the two tests side by side makes it plain that they are not the same, but have a different focus entirely. Indeed, the latter, with its focus on contacts with each state, often devolves into a curious throwback to lex locus, a shortcoming that is abundantly apparent from its application in this case. In contrast, the governmental interest approach looks at contacts with each state, but also seeks to evaluate the policies that underlie the law of each state and to weigh how the application of that law will advance or frustrate the policy choices that each has made.

That is not to imply that the *Restatement (Second)* factors are irrelevant or that they are, when applied as a separate analytical framework, inadequate. In actuality, the majority has overlooked both the way in which this Court has, since *Fu*, appropriately utilized those factors and the manner in which the correct application of the *Restatement (Second)* test would support a result entirely consistent with our traditional governmental interest methodology.

As this Court has explained, the most important factor in deciding a conflict of laws issue is the evaluation of the competing interests of the states. In undertaking this part of our analysis, we examine the policies the Legislature "intended to protect by having [its] law apply to wholly domestic concerns" and then determine "whether those concerns will be furthered by applying that law to the multi-state situation." *Fu, supra,* 160 *N.J.* at 125, 733 *A.*2d 1133 (quoting *Pfizer, Inc. v. Employers Ins. of Wausau,* 154 *N.J.* 187, 198, 712 *A.*2d 634 (1998)). That is to say, once the court has identified the policies that underlie each state's law, it must then consider the effect that applying the law of each state to the particular litigation would have on the policies of each of those states.

As we commented recently:

[I]f a particular policy is designed to enhance a specific group and that group is neither a party to nor potentially affected by the litigation, then that state's interest is not aligned with its policy and it would be unlikely that that state would have the strongest governmental interest in deciding the issue.

[*Rowe, supra,* 189 *N.J.* at 623, 917 *A.*2d 767 (citing *White v. Smith,* 398 *F.Supp.* 130, 134 (D.N.J.1975)).]

Conversely, however, if a policy is designed for the protection of a particular group and that group will be affected by the litigation, then that state's interest in applying its policy will be strong.

Our approach to conflict of laws has therefore evolved beyond the long-abandoned lex locus test in which only the place of the wrong was considered. That, however, is not to say that the place of the wrong is irrelevant to our analysis, for as we have recognized previously, the location of a tort is often of particular

importance. Indeed, both in *Fu* and again in *Erny*, this Court specifically pointed to the importance of a confluence between the place of the wrong and of the injury. In each case, we noted that, if both conduct and injury occur in the same state, the local law of that state will be applied with "rare exceptions," *Fu, supra,* 160 *N.J.* at 125–26, 733 *A*.2d 1133, or except in "rare instances," *Erny, supra,* 171 *N.J.* at 103, 792 *A*.2d 1208.

In each of those decisions, that expression about the importance of the place where conduct and injury occurred was indeed derived from the analysis of the *Restatement (Second)* factors; in neither of those decisions, however, did the inquiry end there. Instead, in both, the Court engaged in the far more complex, nuanced evaluation of governmental interests, counting the interest of the jurisdiction where conduct and injury coincide as one, albeit an important one, of those factors. *See Erny, supra,* 171 *N.J.* at 103, 792 *A*.2d 1208; *Fu, supra,* 160 *N.J.* at 125–26, 733 *A*.2d 1133. More to the point, we have been willing to reject the law of the locus of the injury if a strong interest of the competing jurisdiction dictates otherwise. *See Veazey, supra,* 103 *N.J.* at 248–51, 510 *A*.2d 1187 (applying Florida law to Florida domiciliaries who were injured in automobile accident in New Jersey).

Far, therefore, from the majority's assertion that we have long used the *Restatement (Second)* test, we have merely used the factors and theories embodied in that test to "inform" our application of our governmental interest test. Nor is it accurate to suggest that the *Restatement (Second)'s* factors are devoid of the recognition that the states whose laws might be applied to any dispute have interests to be evaluated and policies to be considered in what is essentially a weighing process. The guiding principles of the *Restatement (Second)* themselves require analysis of the "policies" of the states, *see, e.g.,* § 6(2)(b) ("the relevant policies of the forum"); § 6(2)(c) ("the relevant policies of other interested states"); § 6(2)(e) ("the basic policies underlying the particular field of law"). In focusing narrowly on section 145, expressing the general principles for torts, and section 146, ex-

pressing factors relevant to personal injuries, the majority does not grapple with the directive that all of those factors be evaluated through the prism of the policies expressed by each state. Even section 146, with its apparently narrow reference to place of injury and conduct, demands a broader focus by requiring resort to a section 6 analysis to determine whether "some other state has a more significant relationship." *Restatement (Second) of Conflict of Laws* § 146 (1971).

In the end, I part with the majority because this matter requires the Court to follow no different path than the governmental interest analysis that we have traditionally utilized. Fundamental to that approach, indeed, central to applying the factors identified by the *Restatement (Second)*, is an analysis and a comparison of the public policies that give rise to the laws of the two jurisdictions that are in conflict. The underlying public policies that have led to the abolition of charitable immunity in Pennsylvania are plain in the decision of its highest court; the policies that have fueled its continued viability here are equally plain in the legislative history of our statute. We need look no further than those sources to inform our decision.

## II.

Application of the governmental interest analysis requires a court to consider the policies that support the two different doctrines relating to charitable immunity that are in place in this State and in Pennsylvania.

## A.

The inquiry must begin with the New Jersey Charitable Immunity Act, *N.J.S.A.* 2A:53-7 to -11, and the public policy behind that Act. The doctrine of charitable immunity found its earliest expression in New Jersey in a 1925 decision of the Court of Errors and Appeals, *see D'Amato v. Orange Mem'l Hosp.*, 101 *N.J.L.* 61, 127 *A.* 340 (E. & A.1925), applying a public policy rationale derived from the common law. *Id.* at 64–65, 127 *A.* 340. In 1958,

however, this Court rejected the doctrine in a trio of decisions in which plaintiffs sought to pursue negligence actions against three separate kinds of charities. *See Benton v. Young Men's Christian Ass'n,* 27 *N.J.* 67, 69, 141 *A.*2d 298 (1958) (rejecting charitable immunity for YMCA branch); *Collopy v. Newark Eye and Ear Infirmary,* 27 *N.J.* 29, 47–48, 141 *A.*2d 276 (1958) (rejecting charitable immunity for hospital on public policy grounds); *Dalton v. St. Luke's Catholic Church,* 27 *N.J.* 22, 24–25, 141 *A.*2d 273 (1958) (rejecting charitable immunity for church, based on reasons expressed in *Collopy* ).

In particular, in *Collopy,* a case in which the plaintiff had been injured while he was a hospital patient, the Court listed its reasons for abrogating the doctrine of charitable immunity. Principally, the Court explained that the doctrine was merely a judicially-created one, *see Collopy, supra,* 27 *N.J.* at 31, 141 *A.*2d 276; that it had been eroded over time through court-sanctioned exceptions, *id.* at 31–32, 141 *A.*2d 276; that it had little historical basis as compared to other common law tort duties, *id.* at 32, 141 *A.*2d 276; that it had been increasingly criticized by courts of other states for its "lack of current utility or justification," *id.* at 33, 141 *A.*2d 276; and that it had engendered "overwhelming[ ]" opposition in the "[p]rofessorial and student writings," *id.* at 35, 141 *A.*2d 276. In particular, in rejecting the doctrine, the Court commented that it did so because it wanted to conform the law to what it perceived to be the "prevailing notions of public policy." *Id.* at 39, 141 *A.*2d 276. Two members of the Court filed dissents attacking both the majority's reliance on decisions from other states and commentators, *id.* at 61–67, 141 *A.*2d 276 (Burling, J., dissenting), as well as the theoretical underpinnings and the wisdom of the decision itself, *id.* at 48–61, 141 *A.*2d 276 (Heher, J., dissenting).

Our Legislature responded to this Court's abrogation of the doctrine of charitable immunity swiftly and decisively. *See, e.g., Schultz v. Roman Catholic Archdiocese of Newark,* 95 *N.J.* 530, 533–37, 472 *A.*2d 531 (1984) (explaining statutory history). The initial version of the bill, passed shortly after this Court's three

decisions, included a sunset provision, providing that, unless re-enacted, it would expire a year later. Assembly Committee Substitute for Senate Bill No. 204 (July 22, 1958). It was intended to be a "stopgap" measure to return the State to its pre-*Collopy* status and afford the Legislature an opportunity to further address the question of the usefulness of the doctrine and its limits. Governor Meyner, in signing the 1958 bill into law, explained that the one-year statute would allow time for "the will of the representatives of the people" to be made clear. *See* Governor's Statement on Assembly Committee Substitute for Senate Bill No. 204 (July 22, 1958).

Our Legislature promptly did just that, enacting the Charitable Immunity Act before that first year expired, and without any sunset provision. *L.* 1959, *c.* 90, § 1 (codified at *N.J.S.A.* 2A:53A–7). When our Legislature spoke on the issue, it did so in stark contrast to the views expressed by this Court and the scholars on whom this Court had relied. Our Legislature also made its choice to reinstate the doctrine after the publication of two strongly-worded editorials in the New Jersey Law Journal that argued for a different course. The first applauded the Court's wisdom, proclaiming that "[f]ew will quarrel with the conclusion of the majority that our principles of justice today require that even a charity must pay its just debts and obligations" and commenting on the "impressive array of the considered writings of legal scholars" which the Court found persuasive. *See Justice Before Charity*, 51 *N.J.L.J.* 4 (May 8, 1958). The second, printed as the stopgap bill was being considered, called upon the Legislature to join the "enlightened" jurisdictions that had abolished the doctrine. *See The Senate Acts*, 51 *N.J.L.J.* 4 (June 5, 1958).

In spite of those strong expressions of opinion, the Legislature enacted a law that was explicit in its embrace of the doctrine of charitable immunity as an expression of the public policy of this State. *See N.J.S.A.* 2A:53A–7(a). Although the statute has been amended from time to time, it remains a forceful statement of the will of the citizens as expressed through our Legislature. The

Act's public policy underpinnings are simple and straightforward: namely, an intention to preserve the assets of the charities, specifically the dollars donated to those organizations by the people of our State, so as to devote them to the pursuit of the charities' purposes rather than to permit those dollars to be expended for the payment of damage awards to a particular claimant.

In adopting the Charitable Immunity Act our Legislature essentially reinstated the common law doctrine,[3] including its historically-recognized exceptions. Significantly, our Legislature incorporated the exception that permits an individual who is not a beneficiary of a charity to sue for damages. *See Lindroth v. Christ Hosp.*, 21 *N.J.* 588, 592–93, 123 *A.2d* 10 (1956) (concluding that doctrine did not bar suit against charity by one who was not a beneficiary of its good works).

At the same time, it appears that the Legislature responded to the *Collopy* Court's concern that hospitals being operated as nonprofit entities had far more in common with business ventures than they had with traditional charities. *See Collopy, supra*, 27 *N.J.* at 39–40, 141 *A.2d* 276. The Act therefore permitted suits by beneficiaries of charities operating exclusively as hospitals, albeit with a cap on damages. *N.J.S.A.* 2A:53A–8. This balanced approach demonstrates that the Legislature weighed carefully its decision about whether, and how extensively, to embrace the doctrine of charitable immunity from the start.

In adopting the Act in 1959, the Legislature made clear its intentions about the manner in which the Act was to be construed. From its inception the statute has specifically provided:

This act shall be deemed to be remedial and shall be liberally construed so as to afford immunity to the said corporations, societies and associations from liability as provided herein in furtherance of the public policy for the protection of nonprofit

---

[3] The first version of the bill introduced in response to the Court's trilogy of decisions actually would have extended the scope of charitable immunity, as it would not have included the historical limitation that prohibited beneficiaries from bringing suit. *See* Senate Bill No. 204 (introduced May 5, 1958).

corporations, societies and associations organized for religious, charitable, educational or hospital purposes.
[*N.J.S.A.* 2A:53A–10.]

This expression of the Legislature's intent is unlike the ordinary language utilized to identify the purposes of remedial legislation. Most often, remedial legislation is interpreted so that it is applied liberally for the benefit of claimants. *See, e.g.,* New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49; Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8. The Charitable Immunity Act, however, specifies that it is to be "liberally construed" in favor of the protected entities, that is, the charitable institutions that the Legislature has chosen to shield, and against the interests of those who would make claims against them. *N.J.S.A.* 2A:53A–10.

From time to time, our Legislature has amended the Charitable Immunity Act, but each time it has done so in response to a specific circumstance. More often than not, the amendments have served to broaden rather than to limit or diminish the scope of the Act. For example, in 1987 the Act was amended so that it would extend the scope of immunity to include a variety of officers and volunteers working with charities. *See L.* 1987, *c.* 87 (Senate Bill No. 2705 codified at *N.J.S.A.* 2A:53A–7.1). The Statement of Assembly Insurance Committee that accompanied that bill expressed its reasoning as follows:

Nonprofit organizations have recently experienced difficulty in attracting and keeping qualified individuals to serve as officers and on boards of directors of nonprofit and charitable associations because of the potential exposure to lawsuits which exists. Exposure to liability in these cases often means that the individual's own assets are placed in jeopardy, and many individuals have been reluctant to subject themselves to this risk. By giving immunity to trustees, officers, directors, and other uncompensated volunteers, the bill's purpose is to permit nonprofit and charitable organizations to continue to attract able people to serve in these capacities.

[Assembly Insurance Committee, Statement to Senate Bill No. 2705 (Feb. 5, 1987).]

Even so, as its sponsor commented, the bill provided that officers and directors serving on such boards without compensation would not be protected if "their actions evidence a reckless disregard for their duties." Sponsor's Statement, Statement to

Senate Bill No. 2705 (1986); *see L.* 1987, *c.* 87, § 1(a) (codified at *N.J.S.A.* 2A:53A–7.1(a)). Similarly, in extending the Act's protections to volunteers working on behalf of charities, the Legislature carefully excluded protection for their acts that are "willful, wanton or grossly negligent" or for "damage as the result of . . . negligent operation of a motor vehicle." *L.* 1987, *c.* 87, § 1(b) (codified at *N.J.S.A.* 2A:53A–7.1(b)).

In the following legislative session, the Act's protective scope was extended twice more. First, immunity was afforded to "coaches, managers, or officials of sports teams which are organized under the auspices of or sponsored or funded by counties or municipalities." *See L.* 1988, *c.* 87 (amending *L.* 1986, *c.* 13, and broadening Little League immunity); Assembly Insurance Committee, Statement to Senate Bill No. 1521 (May 23, 1988). Shortly thereafter, the protections of the Act were extended to boards of directors and volunteers of nonprofit blood banks, *see L.* 1988, *c.* 179, § 1 (codified at *N.J.S.A.* 2A:53A–7.2), in recognition of the challenges faced by those important entities and organizations as a result of the AIDS crisis. *See* Sponsor's Statement, Statement to Senate Bill No. 1995 (Feb. 1, 1988).

The 1989 legislative session brought three more extensions of the Act, as bills were enacted to include library trustees, unless reckless, *see L.* 1989, *c.* 171, § 1 (Senate Bill No. 577 codified at *N.J.S.A.* 2A:53A–7.3); officers and volunteers serving nonprofit cemetery corporations organized for the purpose of maintaining or operating burial places, *see L.* 1989, *c.* 249 (Senate Bill No. 1244 codified at *N.J.S.A.* 2A:53A–7.1), and persons serving without compensation on economic development boards, *see L.* 1989, *c.* 283 (Senate Bill No. 235 codified at *N.J.S.A.* 2A:53A–7.1).

In 1995, the Legislature again amended the Act, extending immunity to a broad class of persons in response to concerns that charities were having trouble finding qualified people who were willing to serve on their boards of directors or as volunteers. In doing so, the Legislature spoke loudly about its view of the charitable immunity doctrine in general. In particular, two as-

pects of the Sponsor's Statement in support of the bill that was enacted as *L.* 1995, *c.* 183 (amending *N.J.S.A.* 2A:53A–7) are significant. First, the Sponsor reiterated "the strongly held public policy of protecting charitable institutions against claims by its beneficiaries has been consistently reaffirmed and extended." Statement to Assembly Bill No. 1775 (May 12, 1994); *see also* Assembly Insurance Committee, Statement to Assembly Bill No. 1775 (June 13, 1994).

Second, that statement clearly identifies the public policies and the underlying purpose for the doctrine.

> Given the purpose of the charitable immunity statute, to preserve the assets of the charity, it seems inconsistent with New Jersey public policy for the statute to preclude claims against the institution relating to the actions of its officers or employees, but permit claims directly against those officers or employees who are acting within the scope of their employment and to which the institution answers financially.
>
> [Sponsor's Statement, Statement to Assembly Bill No. 1775 (May 12, 1994).]

During that same time frame, however, the Legislature made it clear that the doctrine is not without limits. In 1991, as part of a more general reform of the health care industry, the cap limiting damages that could be recovered from charities operating exclusively as hospitals was greatly increased. *See L.* 1991, *c.* 187. Although that increase in a potential damage award was part of a larger reform effort that balanced a variety of health care and insurance interests, it suggests that the Legislature again struck a balance in favor of injured plaintiffs rather than the nonprofit hospitals that had long been viewed as more like corporations than charities. In 1995, the Legislature limited the protections afforded to hospitals again, replacing the broadly worded protection with a narrower one for nonprofit hospital corporations, excluding from its scope certain health care providers who were compensated professionals employed by or acting as agents or servants of an otherwise exempt charity. *See L.* 1995, *c.* 183 (codified at *N.J.S.A.* 2A:53A–7(b)).

Of particular significance to the issue now before this Court, the Legislature has not been silent about its view of the scope of

immunity for charities faced with claims of sexual abuse. In fact, the 1995 amendment expressly clarifies that there is no immunity for any of the individuals otherwise protected by the Act if they "caus[e] damage by a willful, wanton or grossly negligent act of commission or omission, including sexual assault and other crimes of a sexual nature." *N.J.S.A.* 2A:53A–7(c). That amendment did not make the charity itself liable to a victim of sexual abuse; it did, however, strip immunity from employees, officers, and volunteers, who otherwise would be within the broad scope of the Act's historically protective sweep.

Even so, the 1995 amendment to the Act demonstrates the Legislature's intention to treat those victims somewhat differently from others. It still did not generally permit suits by beneficiaries, limiting relief to those with claims based on "a willful, wanton or grossly negligent act." *Ibid.* Moreover, it still did not permit suits against the charities themselves, but it signaled a careful and thoughtful response by our Legislature to what was becoming an all-too-frequent occurrence.

The Legislature has since spoken further and has again considered the public policy behind charitable immunity in the face of repeated complaints relating to sexual abuse. In 2006, the Legislature amended the Act to remove immunity in cases involving claims that a charity engaged in negligent hiring and supervision when the negligence proximately caused the sexual molestation of a beneficiary of the charitable organization who was under the age of eighteen. *N.J.S.A.* 2A:53A–7.4 (enacting Senate Bill No. 540). This, too, has been a balanced and limited response. Although the Legislature, for the first time, has permitted a direct claim to be brought against a charity by a beneficiary, it has limited strictly both the nature of the claim that may be brought and the identity of the injured person on whose behalf such a claim may be made.

This lengthy series of enactments, spanning nearly half a century, demonstrates a consistent expression by our Legislature of its desired public policy as it relates to charities. Overwhelmingly, that policy is one of encouraging the operation of charities and

protecting their assets for use in the pursuit of their charitable purposes. It is, as well, a policy of assisting charities in their work by helping them to attract volunteers to serve on their boards and in their endeavors. Moreover, it is a policy of protecting charities' pools of donors who might otherwise decline to contribute to the charitable mission were their donated dollars at risk of diversion from that mission to either litigation or compensation of injured persons except in carefully defined and limited circumstances.

## B.

Pennsylvania's contrary policy as it relates to tort liability and charities is expressed, as the majority points out, in a 1965 decision of its highest court. *Flagiello v. Pa. Hosp.*, 417 *Pa.* 486, 208 *A.*2d 193 (1965). In *Flagiello*, the Supreme Court of Pennsylvania traced the history of charitable immunity and concluded that "[i]f there was any justification for the charitable immunity doctrine when it was first announced, it has lost that justification today." *Id.* at 197.

In discarding a doctrine that it concluded was archaic and lacking in sound reason, the Pennsylvania court was motivated by a number of considerations. First, the court relied heavily on the fact that the defendant in that matter was a hospital, an entity that had been transformed over time from a provider of free medical care for the needy into a large and well-funded "business institution." *Id.* at 196–97. As such, the court considered the history of charities generally and the evolution of many of them into modern businesses. Relying heavily on that evolution, the court reasoned that there was no justification for providing such entities with immunity from suit. *Id.* at 204.

Second, the court relied on its belief that injured citizens of that state were entitled to be compensated. It reasoned that charitable immunity amounted to a denial of equal justice because a citizen injured by any other business would have recourse, but one injured by a hospital would not. *Id.* at 201. Third, the court

pointed out that the doctrine was not absolute, leading to "paradoxical" results that appeared to weigh property interests more heavily than "interest in life and limb." *Id.* at 203 (quoting E.H. Schopler, Annotation, *Immunity of Nongovernmental Charity From Liability For Damages In Tort,* 25 *A.L.R.*2d 29, 40 (1952)). The court noted: "The immunity doctrine offends against fundamental justice and elementary logic in many ways. Thus, while it closes the doors of the courts to a person whose body has been injured, it opens them wide where inanimate property has been damaged through the hospital's maintenance of a nuisance." *Ibid.*

Similarly, as the court explained, the doctrine was not equally applied because that court had concluded, in a series of earlier decisions, that physicians who practiced in hospital settings could, under certain circumstances, be liable not only for their own negligence but for that of other hospital personnel as well. *Ibid.; see Rockwell v. Kaplan,* 404 *Pa.* 574, 173 *A.*2d 54, 57 (1961) (holding "that doctors are subject to the law of agency and may at the same time be agent both of another physician and of a hospital"); *Yorston v. Pennell,* 397 *Pa.* 28, 153 *A.*2d 255, 260–62 (1959) (same); *McConnell v. Williams,* 361 *Pa.* 355, 65 *A.*2d 243, 248 (1949) (holding physician liable to his private patient being treated at hospital, through principles of respondeat superior, for actual negligence of hospital staff intern). In evaluating the question of who or what was being protected by the immunity doctrine, as well as considering on whom the losses caused by negligence at hospitals fell, the court concluded that the doctrine had become "an instrument of injustice," *Flagiello, supra,* 208 *A.*2d at 206, that could no longer be retained. Indeed, the court stated its justification in strong words: "where justice demands, reason dictates, equality enjoins and fair play decrees a change in judge-made law, courts will not lack in determination to establish that change." *Id.* at 208.

Finally, when the Supreme Court of Pennsylvania abrogated the doctrine of charitable immunity in 1965, it announced that it chose

that course in part because other courts had done likewise. Citing decisions from around the country, relying on scholarly pronouncements about what the law should be, and embracing the expressions of the "trend of judicial opinion" as articulated in scholarly commentaries, *see id.* at 197 (citing *Restatement (Second) of Trusts* § 402(2) cmt. d (1959), that court made its decision to change what had previously been a part of the fabric of its common law. That court's opinion abrogating the doctrine of charitable immunity stands today as both its expression of the common law, and its evaluation of the underlying public policy interests, that apply to the citizens of that state.

## C.

One can distill from these two diametrically opposite views on the question of charitable immunity several underlying policy considerations. First, the Pennsylvania court's abrogation of charitable immunity in *Flagiello* arises from public policy considerations common to all torts. That court has elected to focus on the goals of compensating victims injured in circumstances where any other victim would be able to recover. It was guided in part by the emergence of hospitals as "big businesses" that are now far removed from their charitable origins. It considered the role of the courts in seeking to deter conduct that is negligent or careless by imposing a cost on the entity that engages in that conduct. It expressed its intention to align its policies with those of other states. Perhaps most significant, the Pennsylvania court made the protection of the citizens of its own state its primary focus. The values it expressed were virtually identical to the ones that motivated this Court when it decided *Collopy* and the other cases in the trilogy that abrogated the common law doctrine in this State.

On the other hand, our Legislature, in full recognition of those very values and considerations, as expressed in *Collopy,* has spoken clearly, decisively, and repeatedly with a contrary expression of public policy. In our Legislature's view, charities are to be

encouraged to operate and to perform their good works for the benefit of our citizens. Donations to those charities, not only in the form of dollars, but in terms of time and talents of volunteers who serve on their boards and as part of their mission, are to be protected. The purpose of that protection is not only to permit those charities to continue to serve, but to encourage more people to contribute their dollars, their time, and their talents so as to serve the greater public good. Over and over since 1958, our Legislature has both reaffirmed and, where appropriate, extended the scope of the Act to meet those oft-repeated purposes.

At the same time, our Legislature has been neither slavish nor shortsighted in its protection of charities. It has always allowed a limited right to proceed against nonprofit hospitals. It has embraced the common law notion that one who is not a beneficiary of the charity can maintain a cause of action. It has permitted suits to proceed against medical professionals whose connection with the charity is incidental and whose negligence will not be imputed to the charity. It has permitted suits for acts of employees of charities that are wanton, reckless, and grossly negligent. Most recently, it has permitted suits to be brought against the charities themselves on behalf of minors who have been the victims of sexual assault based on a claim that the charity's negligent hiring, supervision, or retention of employees and others was the cause of that assault.

The approach that we have taken to engage in our choice of law analysis has varied with the circumstances, but it has never, until today, strayed from the governmental interest approach. At its core, that framework requires us to identify the public policies involved in each state's statutory or common law and evaluate which jurisdiction has the greater interest in having its law applied to the dispute. In some cases, either the underlying policies or the interests of the states have been unclear and we have looked to the *Restatement (Second)* to inform us about the interests that might bear on the analysis. *See Erny, supra,* 171 *N.J.* at 101–04, 792 *A.*2d 1208; *Fu, supra,* 160 *N.J.* at 122–28, 733

*A*.2d 1133. In others, including most recently, the policies and competing interests that each state was seeking to serve have been readily apparent. *See Rowe, supra,* 189 *N.J.* at 622–23, 917 *A*.2d 767. In all circumstances, however, we have adhered to the governmental interest analysis, varying only with regard to the sources to which we look to identify and understand those governmental interests.

## III.

Engaging in the governmental interest analysis in this matter is aided by the clear expressions of public policy that support our statute and by the thorough explanation of the public policy considerations included in the Pennsylvania court's decision with its contrary views. The task of weighing each against the other requires a consideration of how the application of the two approaches would bear on the effectuation of the expressed public policies of each forum.

The sparse facts are only that P.V. is a New Jersey domiciliary who has Down Syndrome, and that while she was attending camp for her third time during August 2003, she was sexually assaulted by another camper, sought medical attention, and "suffered extreme mental anguish." The only other facts included in the record are that defendant was incorporated as a New Jersey charity and has been in operation since 1975, has its administrative offices here, and operates the camp on property that it leases in Pennsylvania. Nothing in the record reflects where the campers other than P.V. are domiciled or where staff are recruited or trained.

Armed with only these few facts, however, we can engage in our traditional governmental interest analysis. Simply put, if we apply our Charitable Immunity Act to this matter, we will achieve the result that our Legislature has mandated be the litigation outcome for all citizens of our State. In light of the fact that both plaintiff and defendant are citizens of this State, we will have treated them no differently from any other person who is a

beneficiary of one of the charities that operates within our borders. We will have done no more than subject both plaintiff and defendant to all of the benefits and burdens of their domicile. We will at the same time preserve the assets of the charity in a circumstance in which our Legislature has mandated that the entity and its assets be protected.

At the same time, application of our statute to this dispute will do nothing to undermine the common law of Pennsylvania or its goals. Because plaintiff is not a resident of that state, we will not prevent one of Pennsylvania's citizens from recovering a damage award and will not create a distinction between those citizens of that state who may be .compensated and those who cannot. In terms of loss allocation or compensation, we will do nothing to offend or interfere with the policies of our sister state.

Were we to apply our law, we potentially would be sanctioning, at least to some extent, blameworthy conduct that occurred in another state. Thus, if we see tort law generally as a mechanism for conduct regulation, applying our law to conduct that took place in Pennsylvania might not serve that goal. Were this intentional conduct, or were it an act of an employee or agent of the charity, the conduct regulation goal would be significant. Indeed, if the conduct were the reckless or grossly negligent acts of an employee or volunteer, our own Act would lift the cloak of immunity as well.

Here, however, plaintiff makes no claim that any employee, agent, or servant of the charity assaulted her; she makes no claim that a volunteer working at the camp assaulted her. Instead she alleges that another camper, presumably one who was not being monitored or supervised sufficiently, did so. In that context, the conduct to be regulated through Pennsylvania's common law is not sexual assault at all. The conduct, as it relates to the law and the governmental interest that it represents, must be some conduct of the charity. That is to say, the conduct must either be the charity's choice of the other camper to be a participant in its program or its training of its volunteers or paid personnel at the

camp who failed to monitor plaintiff and her free movements around the camp.

Although the injury occurred in Pennsylvania, it is not clear from this record that the conduct on the part of the charity also occurred there. If the charity's conduct is defined as the failure to supervise plaintiff or the other camper, then it occurred principally in Pennsylvania. However, if the legally relevant conduct of the charity is its acts relating to hiring or training its staff, or in recruiting volunteers, or in selecting campers, or in designing the program itself, that conduct likely occurred in New Jersey. As grievous as an act of sexual assault is, the interest of Pennsylvania in regulating whatever conduct of the charity is alleged to have permitted it to occur is attenuated.

Nor would refusal to apply Pennsylvania's policy prevent it from actually regulating the conduct it finds should be compensable. That state has adopted a variety of statutes and regulations governing the operation of camps. *See* 35 *Pa. Stat. Ann.* § 3002 (requiring camps to register with the Department of Health and pay annual registration fee to state treasury); 28 *Pa.Code* § 19.2 (requiring submission of camp building plans to Department of Health); 28 *Pa.Code* § 19.13 (authorizing Department of Health to issue one-year permits to camps that satisfy Department's regulations); 28 *Pa.Code* § 17.11 (requiring local health departments to issue camp permits based on compliance with applicable rules and standards, and requiring regular inspections prior to issuing or renewing permits). Pennsylvania's ability to ensure that camps are operating in accordance with its public policies about standards of care can continue to be addressed in that manner.

On the other hand, applying Pennsylvania's common law to this dispute can and will thwart our Legislature's expression of the will of the people. Charitable dollars, donated to a New Jersey charity for the benefit of this New Jersey resident, will be devoted to litigation and, should plaintiff prevail, to the payment of compensation. At the same time, nothing in this record suggests that this defendant is the sort of "big business" charity that the

Pennsylvania court sought to regulate. Nor can we precisely evaluate the magnitude of the impact that a damage award might have on this charity or its other programs; but we can be certain that dollars that would otherwise be devoted to its charitable works will not be. Whether the dollars available for the charity's other works merely will be reduced, or whether they perhaps will be eliminated through this litigation we cannot know. Whether the charity will conclude that it will no longer be able to operate the camp program we cannot forecast. As our Legislature has cautioned, however, the effect might also be that donors will cease supporting this and other charities, fearing a like fate for their contributions.

Moreover, by applying Pennsylvania's common law to this matter, one New Jersey resident, this plaintiff, will be treated differently for purposes of tort liability from every other beneficiary of our charities, simply because of where she was when the injury occurred. Applying the law of Pennsylvania to this matter might serve that state's general goals, expressed through its common law, of encouraging all who are within its borders to exercise more care, but it will not serve its larger policy goals by compensating a citizen of that state. Instead it will compensate a citizen of this State who, it would appear, did not choose to be in Pennsylvania for any particular protections that the state might offer.

Our traditional governmental interest analysis makes it apparent that the interests of our State, as expressed by our Legislature, will be significantly impaired by the application of Pennsylvania's common law to these two New Jersey citizens. At the same time, Pennsylvania's interests would not be significantly furthered by the application of its own law nor will they be hindered in any meaningful way by the refusal of this Court to apply its law to this dispute.

In embracing a new choice of law methodology and in its application, the majority has abandoned our usual, careful weighing of governmental interests and, in the process, ignored the strong public policy interests undergirding charitable immunity

that have been repeatedly and forcefully expressed by our Legislature. I therefore respectfully dissent.

*For affirmance and remandment*—Chief Justice RABNER and Justices LONG, ALBIN and WALLACE—4.

*For reversal*—Justices LaVECCHIA, RIVERA–SOTO and HOENS—3.