**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3943-23

ANGEL MAY RIDER,

    Plaintiff-Respondent,

v.

JERSEY CITY TRANSFER, INC.,
ALERT MOTOR FREIGHT, INC.,
and ANTHONY COTUGNO, as
Administrator of the ESTATE OF
PAUL DEPASS, deceased,

    Defendants-Appellants,

and

HAIER US APPLIANCE SOLUTIONS,
INC., d/b/a GE APPLIANCES,

    Defendants.

_____

Argued November 18, 2025 – Decided May 18, 2026

Before Judges Rose, DeAlmeida and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-2221-19.

David R. Kott argued the cause for appellants Jersey City Transfer, Inc., Alert Motor Freight, Inc., and Estate of Paul DePass (McCarter & English LLP, attorneys; David R. Kott, of counsel and on the briefs; Daniel M. Schwartz, on the briefs).

Kevin P. O'Brien argued the cause for respondent (Stampone Law PC and Emeka Igwe (The Igwe Firm), attorneys; Emeka Igwe, of counsel; Kevin P. O'Brien, of counsel and on the brief).

PER CURIAM

Around 3:30 a.m., on December 21, 2018, plaintiff Angel May Rider was severely injured during the third of three successive collisions on Interstate 95 (I-95) in Maryland, while commuting from her home in New Jersey to her place of employment in Maryland. While merging onto I-95, plaintiff's vehicle collided with a white Kia vehicle, disabled from a hit-and-run prior collision and situated perpendicularly in her lane of travel. After impact, plaintiff exited her car and stood on the roadway side of the guardrail while speaking with a 9-1-1 operator. One minute later, a tractor trailer traveling in that same lane attempted to avoid plaintiff's disabled car, jackknifed, and crushed her against the guardrail. By all accounts, the roadway was wet from rain.

Plaintiff ultimately lost both legs, nearly severed upon impact. Confined to a wheelchair, plaintiff has required – and will continue to need – surgeries,

2

A-3943-23

physical therapy, and home care assistance. Plaintiff was twenty-two years old at the time of the accident.

Pertinent to this appeal, in her third amended complaint, plaintiff asserted negligence and related claims against the tractor trailer owners, Jersey City Transfer and Alert Motor Freight, and their driver at the time of the crash, Paul DePass by Anthony Cotugno, Administrator of the Estate of Paul DePass (collectively, defendants).[1] Following the close of discovery, the motion judge denied defendants' choice-of-law application, seeking application of Maryland's contributory negligence law and statutory cap on damages, and request to bifurcate plaintiff's liability and damages claims.

Prior to opening statements, the trial judge, who had not decided the pretrial motions, denied defendants' in limine applications to exclude a photograph of plaintiff's mangled legs, taken while she was in the emergency room, and medical illustration depicting an above-the-knee amputation.

During the April 2024 multi-day trial, plaintiff testified and presented the testimony of seven experts and four lay witnesses, including the deposition

---

[1] DePass died from unrelated causes during litigation; thereafter, his estate was substituted as a party. Defendant Haier US Appliance Solutions, Inc., d/b/a GE Appliances, was dismissed on summary judgment and is not a party to this appeal.

A-3943-23

testimony of DePass and Brandon Ruzicka-Napier,[2] the driver of the disabled Kia vehicle plaintiff struck. Defendants called one witness, their accident reconstruction expert. The jury also considered documentary evidence, including the objected-to medical illustration and photograph.

At the close of all evidence, the judge denied defendants' application to reconsider the motion judge's decision on choice of law. The trial judge also denied defendants' motion for a directed verdict.

At the conclusion of trial, the jury unanimously found defendants negligent and their negligence was the proximate cause of plaintiff's injuries. By a 7-1 vote, the jury found plaintiff was not negligent. The parties having stipulated to $559,413.13 in past medical care expenses, the jury awarded other damages as follows: $2.5 million in past and future lost wages; $25 million in future medical care expenses; $3 million in "[p]ast pain and suffering, embarrassment and humiliation, disfigurement, loss of ability to enjoy life's pleasures, and disfigurement"; and $23,940,587 in "[f]uture pain and suffering, embarrassment and humiliation, disfigurement, loss of ability to enjoy life's pleasures, and disfigurement."

---

[2] Consistent with the parties' briefs, we refer to Brandon Ruzicka-Napier as Napier.

A-3943-23

On May 6, 2024, the trial judge molded the verdict, awarding plaintiff $54,469,250.13, plus $4,832,722.91 in prejudgment interest, for a total of $59,301,973.04. On July 18, 2024, the judge issued a written statement of reasons and accompanying order denying defendants' alternative motions for judgment notwithstanding the verdict, a new trial, or remittitur.

Before us, defendants raise six points, seeking reversal and a new trial. In their first three overlapping arguments, defendants contend plaintiff was negligent as a matter of law by striking the disabled vehicle and placing herself in a position of peril. Defendants therefore contend: the judge erroneously denied their motion for a directed verdict; the judge failed to issue a "Dolson[3] charge";[4] and the jury's answer on the question of plaintiff's negligence was against the weight of the evidence. In their fourth point, defendants maintain "Maryland's rules of the road must be applied to questions of substantive negligence." In their fifth point, defendants assert the jury's award on future medical expenses was "grossly excessive." Lastly, defendants claim the cumulative effect of the trial errors, including the court's failure to grant their

---

[3] Dolson v. Anastasia, 55 N.J. 2 (1969).

[4] Model Jury Charges (Civil), 5.30(D), "Violation of Traffic Act" (approved Aug. 1999).

5

pretrial bifurcation motion and in limine motion to exclude the photograph and illustration, warrant reversal of the jury's verdict. Unconvinced, we affirm.

## I. Liability

### A. Trial Evidence

Plaintiff testified she left her New Jersey home around 3:00 a.m. on the morning of the accident and headed to work at Peet's Coffee, located in a Maryland rest stop on I-95. Plaintiff testified she moved to her mother's home in New Jersey from Maryland about ten days before the accident. Along the way to work, plaintiff made a quick stop for breakfast at another rest stop in Elkton, Maryland.

Around the same time, Napier, a New Jersey resident and United States Marine, was traveling south on I-95 to Camp Lejeune in North Carolina. While enroute, a vehicle sideswiped Napier's white Kia vehicle, causing the first accident. At deposition, Napier testified he lost control and hit the guardrail, resting in the far-right lane of traffic. The other car fled the scene; Napier's car would not start. Napier exited his car, called his father, and "sat next to the guardrail on the other side, the safety side."

In the meantime, plaintiff merged onto I-95 from the rest stop, attempting to "match pace" with oncoming traffic, when she saw the disabled white car

6

"sideways facing oncoming traffic" in her lane. Plaintiff testified she was unable to stop before impact, the wet roads causing her to skid. Plaintiff estimated she was traveling about sixty-one miles per hour at the time of the crash. While speaking with the 9-1-1 operator, plaintiff exited her vehicle with Napier's assistance and leaned against the inside of the roadside guardrail. Plaintiff testified she heard tires screeching, but did not see the tractor trailer that struck her.

When deposed, DePass stated he observed plaintiff's car stopped in his lane. He stepped on the brakes, and because there was traffic to his left, he moved to the right, attempting to avoid plaintiff's vehicle. But his truck jackknifed and hit the guardrail.

Plaintiff also presented the testimony of Stephen R. Benanti, an expert in accident reconstruction, particularly regarding tractor trailers and commercial motor vehicles. Describing the requirements set forth in the New Jersey commercial driver's license manual, Benanti opined, because the tractor trailer was unloaded at the time of the accident, it was more difficult for DePass to stop. Noting DePass stated he was traveling fifty-eight miles per hour, Benanti opined that speed was too fast in light of the hazardous conditions presented at the time of the crash. According to Benanti, to account for the wet and slippery

7

driving conditions and low visibility, DePass should have been traveling at about forty-four miles per hour. Benanti also testified about the Federal Motor Carrier Safety Regulations, 49 C.F.R. 392.14, and the requirement that drivers use extreme caution and reduce speed in hazardous conditions. Benanti ultimately concluded DePass caused the collision and plaintiff's injuries.

Benanti also addressed plaintiff's speed prior to her collision with Napier's vehicle. He testified the crash data from the black box in plaintiff's car revealed she was driving under the sixty-five-mile-per-hour speed limit prior to impact. Specifically, he testified the data "indicate[d] that five seconds prior to impact, the vehicle was traveling at 62.1, and then it increased to 64.3 [miles per hour] approximately two seconds before impact. And then at one second before impact, it dropped from 60.9 to 43" miles per hour.

Defendants countered with Nicholas Bellizzi, their accident reconstruction expert. Bellizzi testified the commercial driver's license manual was not law, but rather a recommendation that during inclement weather a driver should reduce speed by about one third. He opined DePass "did not have enough time and distance to avoid this collision." More particularly, DePass "tried to do what he could do to avoid a collision, but he wasn't successful, which indicates that he didn't have enough time to see it, to recognize what it [wa]s."

A-3943-23

Bellizzi also opined plaintiff was responsible for the collision with Napier's vehicle. However, Bellizzi acknowledged plaintiff was traveling at an appropriate speed when she entered the highway just prior to hitting Napier's disabled vehicle.

### B.  Motion for a Directed Verdict

Before the trial judge, defendants moved for a directed verdict. Citing plaintiff's testimony, defense counsel argued plaintiff's "lack of reasonable and prudent operation" of her car "was the cause of, at least, the middle accident, which put her into the spot that she was in." Counsel thus contended plaintiff placed "herself in a position of peril."

The judge denied the motion finding, in pertinent part:

> There's no doubt in my mind that there's a sufficient basis based upon the evidence that was presented . . . for a determination that could be made . . . by this jury that . . . DePass deviated from the accepted standard of care.
>
> In other words, was negligent. The degree of that negligence and the comparativeness, if that's a word, with regard to the plaintiff's negligence, if any, is for the jury to decide.
>
> . . . .
>
> It is clear to me that this jury could very well find negligence on the part of . . . plaintiff and that's the thrust of your argument.

9

> I understand that . . . reasonable minds can differ with regard to the level of negligence on the part of . . . DePass and his employer.

We review de novo a motion for a directed verdict under Rule 4:40-1, applying the same standard governing trial judges. See Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016). The court must "accept as true all evidence presented by [the] plaintiff and the legitimate inferences drawn therefrom to determine whether the proofs are sufficient to sustain a judgment in his [or her] favor." Carbajal v. Patel, 468 N.J. Super. 139, 158 (App. Div. 2021) (citing Monaco v. Hartz Mountain Corp., 178 N.J. 401, 413 (2004)). "[I]f reasonable minds could differ as to whether any negligence has been shown, the motion should be denied." Ibid. (alteration in original) (quoting Bozza v. Vornado, Inc., 42 N.J. 355, 357-58 (1964)). The motion may be granted only "where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action." Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008).

On appeal, defendants maintain "[p]laintiff was negligent in the operation of her vehicle" by striking Napier's stopped car in her traffic lane. To support their argument, defendants reference Dolson, the tailgating statute, N.J.S.A.

39:4-89, and our decision in Jones v. Bennett, 306 N.J. Super. 476 (App. Div. 1998). Defendants' contentions are misplaced.

In Dolson, the defendant struck the plaintiff's vehicle from behind while traveling in the same lane of traffic. 55 N.J. at 4. The jury returned a no-cause verdict, and the trial court denied the plaintiff's motion for a new trial. Ibid. Relevant here, our Supreme Court addressed the plaintiff's negligence claim. Id. at 5-9. Citing N.J.S.A. 39:4-89, the Court held a speeding driver who fails to follow another vehicle at a safe distance to avoid a collision is negligent and the jury should be so instructed. Id. at 10.

The Court reasoned:

> It is elementary that a following car in the same lane of traffic is obligated to maintain a reasonably safe distance behind the car ahead, having due regard to the speed of the preceding vehicle and the traffic upon the condition of the highway. Stackenwalt v. Washburn, 42 N.J. 15, 30 (1964). Failure to do so resulting in a collision, is negligence and a jury should be so instructed.
>
> [Ibid.]

The Court therefore concluded, in that case, "the verdict was against the weight of the evidence so as to constitute a miscarriage of justice" and, as such, the trial court erroneously denied the plaintiff's new trial motion. Id. at 12.

11

We later clarified N.J.S.A. 39:4-89, "insofar as it requires motorists to maintain safe following distances, is founded upon the foreseeability of [sudden] braking situations." Paiva v. Pfeiffer, 229 N.J. Super. 276, 283 (App. Div. 1988); see also La Mandri v. Carr, 148 N.J. Super. 566, 571 (App. Div. 1977) ("This kind of driving is commonly referred to as 'tailgating.'"). Accordingly, when a defendant is tailgating and rear-ends the vehicle ahead, "the Dolson principles should be charged" to the jury. Paiva, 229 N.J. Super. at 282. "Whether the duty to follow at a safe distance is observed or breached is for the jury to decide based upon all the circumstances of the case." Id. at 283.

In Jones, the plaintiff's vehicle broke down in the center lane of the Garden State Parkway and came to a complete stop. 306 N.J. Super. at 479-80. Five seconds later, the defendant struck the plaintiff's vehicle from behind while traveling approximately 87.46 miles per hour. Id. at 481-82. The trial court directed a verdict against the defendant. Id. at 485. We affirmed, concluding the evidence presented no reasonable scenario where the jury could find the defendant not negligent. Ibid. We rejected the defendant's argument that the "sudden emergency" doctrine applied because the defendant was traveling more than the speed limit. Ibid. We concluded the defendant should have had time to react to the stopped vehicle. Ibid. We held:

> "To invoke the sudden emergency doctrine and to be entitled to that charge to the jury, a party must have been confronted by a sudden emergency over which he [or she] had no control, without fault on his [or her] part." Roberts v. Hooper, 181 N.J. Super. 474, 478 (App. Div. 1981). Accordingly, failure to maintain a reasonable following distance warranted a Dolson charge.
>
> [Ibid.]

In the present matter, plaintiff contends "[defendants] overstate Dolson's and Jones's reach." Quoting our holding in La Mandri, 148 N.J. Super. at 571, plaintiff counters "[N.J.S.A. 38:4-89] was not intended to apply indiscriminately to any case in which the front of one vehicle comes into contact with the rear of another, irrespective of how the collision occurred."

In La Mandri, we evaluated the plaintiff's contributory negligence in a vehicle collision when the defendant's negligence was previously conceded. Id. at 568-69. There, the defendant drove past the plaintiff on the highway, lost control of her vehicle, spun around, and hit the front of the plaintiff's vehicle. Id. at 569-70. Noting the lack of any evidence suggesting the plaintiff was "tailgating," we concluded N.J.S.A. 39:4-89 was inapplicable and the court erroneously issued the Dolson instruction. Id. at 572. We further held:

> [T]he proofs presented a jury issue as to whether [the] plaintiff used reasonable care and caution for her own

13

safety in the control, management and operation of her automobile, and whether she exercised such judgment to avoid a collision with [the] defendant's vehicle as a reasonably prudent person would have done in the existing circumstances.

[Id. at 573.]

In the present matter, accepting as we must the truth of plaintiff's evidence, she was traveling below the speed limit when she encountered and hit Napier's disabled vehicle in the road. Further, defense expert Bellizzi acknowledged plaintiff was traveling an appropriate speed when she entered the highway just before she hit Napier's disabled vehicle. Thus, the record is bare of any evidence suggesting plaintiff was tailgating or following at too close a distance behind Napier's car.

Moreover, to succeed on a directed verdict motion, defendants were required to demonstrate plaintiff was more than fifty percent at fault for the collision between her and defendants' tractor trailer. See Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 109 (2004) (pursuant to New Jersey's comparative negligence principles, set forth in N.J.S.A. 2A:15-5.1, "a plaintiff who is found to be more than fifty percent at fault is entitled to no recovery."). The evidence did not support defendants' argument. Instead, plaintiff's expert opined DePass was traveling significantly faster than the recommended speed limit for a

commercial vehicle in hazardous conditions, creating a situation where he could not stop to avoid the collision. Because reasonable minds could differ as to whether any negligence was demonstrated by either party, we conclude the trial judge correctly denied defendants' directed verdict motion.

## C. Dolson Charge

We similarly reject defendants' contention that the trial judge failed to issue a Dolson charge pursuant to Model Jury Charges (Civil), 5.30(D), "Violation of Traffic Act" (approved Aug. 1999). On this point, the parties dispute whether defendants requested the charge. Plaintiff argues defendants failed to object to the final charge as issued and their defense at trial was predicated on her failure to stay on the "safe side" of the highway guardrail, not her fault in the collision with Napier's vehicle.

During the charge conference, defense counsel asked, "[D]o you have 530(D)?" An unidentified speaker responded, "That's right here, yeah." Defense counsel did not elaborate or otherwise expressly request the charge regarding plaintiff's alleged negligence. Instead, defense counsel's inquiry apparently followed plaintiff's request for the charge vis-à-vis DePass's negligence.

Whether viewed through the prism of harmless or plain error, see R. 2:10-2, we are satisfied the judge properly instructed the jury on negligence. We

15

recognize the burden of demonstrating entitlement to a jury instruction differs from, and is less than, the burden underlying a directed verdict motion. In civil trials, the trial court should issue a jury instruction if "there is a reasonable factual basis in the evidence to support th[e] claim or defense." Walker v. Costco Wholesale Warehouse, 445 N.J. Super. 111, 120 (App. Div. 2016); cf. Carbajal, 468 N.J. Super. at 158 (reiterating a plaintiff on a directed verdict motion is afforded the truth of all evidence and legitimate inferences).

As we stated above, however, in this matter there was no evidence adduced at trial that plaintiff's collision with Napier's vehicle was caused by her tailgating or following his car. Napier's car was disabled when plaintiff struck its side. We conclude the totality of the evidence presented at trial did not warrant issuance of a Dolson charge.

### D. Jury Question and Verdict on Plaintiff's Negligence

Defendants contend no reasonable mind could conclude plaintiff was not negligent in the collision with Napier's vehicle. Seeking a new trial, defendants claim the jurors committed error by failing to attribute negligence and comparative negligence following their consideration of the evidence surrounding plaintiff's collision with Napier's car and her failure to move to a safe position on the roadway thereafter.

16

In his decision on defendants' motions for judgment notwithstanding the verdict or a new trial, the trial judge evaluated the jury's verdict under the governing standard pronounced in Rule 4:49-1. Mindful not to act as the "thirteenth and decisive juror" the judge found the verdict was not against the weight of the evidence. The judge explained comparative negligence was a jury question, and the jury was free to accept plaintiff was negligent when she hit Napier's vehicle or when she failed to move to "safety" on the other side of the guardrail. The jury found neither. The judge therefore declined to substitute his judgment for that of the jury.

Well-settled principles guide our review. A trial court shall grant a motion for a new trial, "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a); see also Dolson, 55 N.J. at 6-7. The same miscarriage of justice standard applies on appellate review. R. 2:10-1 ("The trial court's ruling on . . . a [new trial] motion shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law."). As our Supreme Court has explained, "A miscarriage of justice has been described as a pervading sense of wrongness needed to justify . . . [the] undoing of a jury verdict." Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J.

506, 521 (2011) (quoting <u>Lindenmuth v. Holden</u>, 296 N.J. Super. 42, 48 (App. Div. 1996)) (internal quotation marks omitted).  A miscarriage of justice "can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust result."  <u>Ibid.</u> (alteration in original).

Having considered defendant's contentions in view of these principles, we conclude they lack sufficient merit to warrant further discussion in a written opinion.  <u>R.</u> 2:11-3(e)(1)(E).  We affirm substantially for the reasons stated in the judge's cogent written decision.  Discerning no miscarriage of justice, we decline to disturb the jury's verdict on plaintiff's lack of negligence.

## II.  Choice of Law

In his oral decision denying defendants' pretrial request to apply Maryland's one percent contributory negligence law and $500,000 non-economic damages limitation,[5] the motion judge reasoned New Jersey law applied in this matter because all parties to the litigation were New Jersey residents and this state has an interest in ensuring its residents are compensated

---

[5]  As plaintiff accurately notes in her responding brief, because her claim for non-economic damages arose on October 1, 2018, the cap was $860,000, <u>see</u> Md. Code Cts. & Jud. Proc. § 11-108(b)(2)(ii), and any award above that limitation was subject to reduction by the trial court, <u>see</u> § 11-108(d)(2)(i).

18

and protected. In so holding, the judge further concluded New Jersey's comparative negligence statute applied and each party's negligence was a question for the jury. At the close of all evidence, the trial judge summarily denied defendants' reconsideration motion, finding the evidence presented at trial did not warrant a different conclusion than that reached by the motion judge.

Before us, defendants argue because the accident occurred in Maryland, that state's "rules of the road must be applied to questions of substantive negligence." Although all parties were residents of New Jersey at the time of the accident, defendants maintain Maryland has a predominant interest in regulating the conduct of motor vehicle drivers within its borders. Defendants urge us to apply Maryland law on the substantive issues of assumption of the risk, contributory negligence, rear-end accidents, and the non-economic damages cap. Seeking a new trial, defendants argue "had Maryland law been applied, [they] would have tried the case differently."

We review de novo choice of law issues because they involve legal decisions. Cont'l Ins. Co. v. Honeywell Int'l, Inc., 234 N.J. 23, 46 (2018). "[W]hen a civil action is brought in New Jersey, we use New Jersey choice-of-

law rules to decide whether this state's or another state's legal framework should be applied." Ibid.

Under New Jersey's choice-of-law rules, "the first inquiry 'is whether the laws of the states with interests in the litigation are in conflict.'" In re Accutane Litig., 235 N.J. 229, 254 (2018) (quoting McCarrell v. Hoffmann-La Roche, Inc., 227 N.J. 569, 584 (2017)). "A conflict of law arises when the application of one or another state's law may alter the outcome of the case . . . or when the law of one interested state is 'offensive or repugnant' to the public policy of the other." Ibid. (citation omitted). If no conflict exists, "there is no choice of law issue to be resolved." Ibid. (quoting P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 143 (2008)). Accordingly, "the forum state applies its own law." Ibid. If a conflict exists, the court must then determine which state's substantive law applies. Id. at 257.

In the present matter, the parties do not dispute a conflict of law exists regarding the application of contributory or comparative negligence.[6] Maryland

---

[6] In her responding brief, plaintiff additionally argues "New Jersey and Maryland law do not conflict on the substantive rules that govern drivers' conduct." Plaintiff contends both states "apply the same general rules of the road for operating motor vehicles, including operating commercial motor vehicles." Although that may be true, the application of each state's comparative negligence laws, not the motor vehicle laws, controls here.

A-3943-23

prohibits recovery when the plaintiff's own negligence contributes to the injury, even if the defendant also is negligent. See S & S Oil, Inc. v. Jackson, 53 A.3d 1125, 1131 (Md. 2012). Conversely, New Jersey is a modified comparative negligence state provided the plaintiff's "negligence was not greater than the negligence of the person against whom recovery is sought or was not greater than the combined negligence of the persons against whom recovery is sought." N.J.S.A. 2A:15-5.1. We therefore discern no error in the motion judge's determination that an actual conflict existed between New Jersey and Maryland law.

Having determined an actual conflict exists here, we turn to the significant relationship test set forth in the Restatement (Second) of Conflict of Law (A.L.I. 1971), adopted by our Supreme Court in Camp Jaycee. 197 N.J. at 143-144. The significant relationship test presumes the law of the place of injury should govern, unless another state has a more significant relationship. Id. at 144. Thus, the first contact to examine is the location of the injury as the law of the place where the injury occurred is presumed to apply. Ibid. (citing Restatement (Second) of Conflict of L. § 146 (A.L.I. 1971)).

However, the presumption can be overcome by a more significant interest of another state, and thus the next step in the analysis is to examine whether

such an interest exists. Id. at 144-45. That determination is driven by application of the "remaining contacts set forth in [Restatement] sections 145 and the cornerstone principles of [Restatement] section 6." Id. at 144.

Pursuant to section 145, the most significant relationship to the occurrence can be measured by assessing the following four criteria: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Id. at 141 (quoting Restatement (Second) of Conflict of L. § 145 (A.L.I. 1971)). The analysis of the states' contacts should not focus on quantity over quality. Id. at 147.

"Viewed through the section 6 prism, the state with the strongest section 145 contacts will have the most significant relationship to the parties or issues, and thus its law will be applied." Id. at 143. "Reduced to their essence, the section 6 principles are: '(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states.'" Id. at 147 (quoting Erny v. Est. of Merola, 171 N.J. 86, 102 (2002)). Our Supreme Court has consolidated the section 6 analysis by "ask[ing], simply, whether

22

application of the competing states' laws would advance the policy interests that the law was intended to promote." Cont'l Ins. Co., 234 N.J. at 58; see also Pfizer, Inc. v. Emps. Ins., 154 N.J. 187, 198 (1988).

In Camp Jaycee, the Court conducted a choice of law analysis where the plaintiff, a mentally disabled New Jersey resident, was sexually abused at the defendant summer camp located in Pennsylvania but owned and operated by a not-for-profit New Jersey corporation. 197 N.J. at 135-36. An actual conflict of law existed between the law of both states regarding charitable immunity from tort liability: New Jersey provided immunity "from most tort liability"; Pennsylvania held charitable organizations liable for misconduct. Id. at 143-44.

Similar to the present matter, the parties disagreed as to which state had the most significant relationship to the parties, issues, and occurrence under a section 145 analysis. The Court first considered "the place where the injury occurred," noting "[t]he place of injury becomes less important when it is simply fortuitous." Id. at 145 (quoting Fu v. Fu, 160 N.J. 108, 126 (1999)). "The place of the injury is fortuitous when 'it bears little relation to the occurrence and the parties with respect to the particular issue.'" Id. at 146 (quoting Restatement (Second) of Conflict of L. § 145 (A.L.I. 1971)).

A-3943-23

Noting the conduct and injury occurred in Pennsylvania, the Court concluded that state was not a "fortuitous" location. Id. at 151. The Court reasoned:

> Camp Jaycee has a continuous and deliberate presence in Pennsylvania. The camp is tasked with the responsibility of supervising and caring for mentally disabled campers for extended periods of time within the commonwealth. It is that perennial presence and activity in Pennsylvania that is inextricably intertwined with Pennsylvania's interest in conduct-regulation.
>
> [Ibid.]

Considering the third contact, the Court noted the plaintiff was a New Jersey resident, but chose to attend camp in Pennsylvania, and the defendant camp was incorporated in New Jersey. Id. at 146. However, the Court determined "a corporation's principal place of business is a more important contact than the place of incorporation," especially "where the corporation does little, or no, business in the latter place." Ibid. (quoting Restatement (Second) of Conflict of L. § 145 cmt. e (A.L.I. 1971)). Undertaking an in-depth analysis, the Court concluded the defendant's contact with Pennsylvania was more significant than its ties to New Jersey because the defendant was incorporated for the sole purpose of doing business, by running its camp, in Pennsylvania. Id. at 146-47.

A-3943-23

Although the plaintiff's injury and the defendant's place of business were located in Pennsylvania, quantitatively outweighing New Jersey's contacts, the Court nonetheless considered the section 6 factors and measured the significance of each state's contacts. Id. at 147. Through this analysis, the Court concluded the presumption was not overcome. Id. at 155-56.

Initially, the Court balanced the tort law principles of each state:

> It is [Camp Jaycee's] perennial presence and activity in Pennsylvania that is inextricably intertwined with Pennsylvania's interest in conduct-regulation. If Pennsylvania's tort law is to have any deterrent impact and protect other campers from the type of harm inflicted upon [the plaintiff], it must be applied in situations where tort-feasors repeatedly perform their tasks within the state, regardless of the home state of the campers. . . .
>
> Concededly, New Jersey's interest in protecting its charitable corporations is aligned with the parties' co-domiciliary status in this state. However, where, as here, the plaintiff chooses to attend camp and the corporation opts to perform its primary charitable acts outside the state, the strength of that contact is diluted. Indeed, immunity laws are designed to encourage persons to engage in the particular conduct within the state. Where [the] defendant's conduct takes place in another state, the immunity goals are diminished.
>
> [Id. at 151-52.]

Next, the Court evaluated comity considerations stating, "New Jersey can continue to protect charities operating in this state even if the law of

Pennsylvania is applied to the Pennsylvania activities in this case. The converse is not true." Id. at 153. Finally, the Court determined the interest of judicial administration yields to the state's relationship with the parties and the issues. Id. at 154-55. The Court therefore applied Pennsylvania law. Id. at 156.

In the present matter, the motion judge evaluated the interests of both states on the disputed issues and concluded, because all parties were residents of this state, "it [wa]s in New Jersey's interest to ensure . . . plaintiff c[ould] be fully compensated and fairly compensated in this case." The judge found New Jersey law applied.

Before us, defendants maintain plaintiff failed to overcome the location of the injury presumption and Maryland had the predominant interest in the litigation. They further argue the motion judge did not conduct a most significant relationship test as he failed to consider Restatement sections 6, 145, and 146. Citing the Court's decision in Camp Jaycee, defendants emphasize plaintiff: was a Maryland resident ten days before the accident; was driving to her place of employment in Maryland; and had a Maryland driver's license, automobile insurance, and vehicle registration. They further assert DePass was driving to a distribution center in Maryland. Having conducted a de novo review

26

of the motion and trial records, we agree with the motion judge's determination New Jersey law applied here.

We commence our analysis of the most significant relationship test by initially considering the section 145 contacts. The first contact is the location of the injury and, as such, under section 146 the law of Maryland is presumptively applicable.

To dismantle that presumption, plaintiff characterizes the Maryland location as "fortuitous." Our Supreme Court has acknowledged, "[T]he occurrence of any automobile accident, and therefore its precise location, is always 'fortuitous' in that accidents by their very nature are unexpected and unpredictable." Fu, 160 N.J. at 137. However, the Court also explained when the parties anticipate their presence in a jurisdiction at the time of the automobile accident, the location is no longer fortuitous: "The place of an accident . . . may be considered fortuitous only when the driver did not intend or could not reasonably have anticipated being in that jurisdiction at the time of the accident." Ibid.

Under this reasoning, the location of the collision was not fortuitous. Plaintiff was traveling to her place of business in Maryland and DePass was traveling to a known, and often used, distribution center in Maryland. Although

27

the precise location of the collision may have been fortuitous under Fu, the parties certainly anticipated traveling on I-95 in Maryland, with a "continuous and deliberate presence" in that state. Camp Jaycee, 197 N.J. at 151.

The second contact, "the place where the conduct causing the injury occurred," follows the same logic as our first contact analysis. These contacts weigh in favor of applying Maryland law.

The third contact is the parties' domicile or residence. The domiciliary facts are uncontested: plaintiff was a New Jersey resident – albeit for a few days before the accident; Jersey City Transfer and Alert Motor Freight are New Jersey entities; and DePass was a New Jersey resident. Each of defendants' arguments noted above attempting to undermine those facts is futile. Domicile is not grey, but rather absolute. "It is everywhere conceded that a person can have only one true domicile." State v. Benny, 20 N.J. 238, 251 (1955). This contact weighs in favor of applying New Jersey law.

The fourth contact, "the place where the relationship, if any, between the parties is centered" is not applicable here as the parties had no prior relationship.

Under the four contact points of section 145, the "contacts ledger," see Camp Jaycee, 197 N.J. at 147, appears split. However, weighing these findings

through the section 6 lens, as we must, see ibid., the scales tip in favor of New Jersey.

Regarding interstate comity, Maryland law is not frustrated by the application of New Jersey's comparative negligence statute. Consistent with the Court's rationale in Camp Jaycee regarding Pennsylvania's tort law and its goals, New Jersey's comparative negligence law "was the Legislature's response to the harshness of the complete bar to recovery imposed by the rule of contributory negligence." Van Horn v. William Blanchard Co., 88 N.J. 91, 94 (1981) (superseded by amendment, L. 1982, c. 191, on other grounds).

Conversely, Maryland's contributory negligence laws produce the polar opposite result New Jersey sought to abolish. Maryland's laws are not diminished when applied to the New Jersey parties here as their application could serve to reduce responsibility for negligent conduct. Although our Supreme Court has stated, "[u]nder principles of comity the courts of New Jersey will recognize and follow [another state's] laws relating to traffic safety," Mellk v. Sarahson, 49 N.J. 226, 230 (1967), the present conflict of laws concerns the application of contributory negligence laws, not traffic laws.

Turning to the interests of the parties, New Jersey has a clear interest in protecting its residents and proportionate liability in tort claims. As New Jersey

residents, the parties reasonably could anticipate their potential liability and exposure under this state's comparative negligence laws, rather than Maryland's "all or nothing" liability approach. Regarding the interests in judicial administration factor, the Court has recognized more critical concerns as discussed above. See Camp Jaycee, 197 N.J. at 154-55; Erny, 171 N.J. at 102 (describing the factor as "less significant"); see also Fu, 160 N.J. at 136. Finally, concerning the competing interests of the states, New Jersey's interest in fully compensating its resident for her substantial and life altering injuries outweighs Maryland's interest in limiting compensation exposure to a non-resident. Notwithstanding defendants' contentions to the contrary, we conclude the Court's decision in Camp Jaycee does not command a different result.

### III. Damages

### A. Trial Evidence

After the accident, the Maryland State Police and EMS arrived on scene. Plaintiff was transported by ambulance to Christiana Hospital in Delaware, where she was treated inpatient for two months. Nicholas Quercetti, D.O., a board-certified, orthopedic trauma surgeon amputated both legs to save her life as they were partially amputated by the accident. Using the medical illustration,

Dr. Quercetti described his amputation surgery to plaintiff's right leg through the femur, and her left leg through the knee.

Plaintiff underwent fifteen surgeries – some addressed necrosis; one was required to completely remove plaintiff's right femur. On her right side, plaintiff's body now ends at her pelvis and gluteal muscles. Dr. Quercetti opined, in addition to requiring ongoing management and care, "[i]t's not out of the question that she would need another surgery down the road for a recurrent bone infection."

Following the surgeries at Christiana Hospital, plaintiff was admitted to a rehabilitation facility in Delaware for one week. Plaintiff testified, at the time of trial, she continued to experience phantom pain, pain in her stumps, and was under constant watch for recurring infections.

Also at that time, plaintiff was under the care of Guy Fried, M.D., for rehabilitation medicine and was projected to need such care for the rest of her life. Dr. Fried explained, other than suffering as a double amputee, plaintiff also sustained other injuries during the accident including, two "popped" lungs, bleeding in her liver, and bleeding in her abdomen. Dr. Fried described the complicated prosthetics plaintiff requires, the effort it takes to use the prosthetics, and the injuries resulting from the overuse of her arms and

31

A-3943-23

shoulders. For example, something as basic as using the bathroom is difficult, time-consuming, and "not great for the shoulders." Because plaintiff's left femur "keeps on growing," Dr. Fried opined plaintiff would continue to need surgeries "to chop away . . . at the extra bone."

Dr. Fried also testified about plaintiff's future medical needs and her "life care plan" formulated by her expert, Alex Karras. Dr. Fried opined it was reasonable to anticipate plaintiff's prosthetics would cost $9.2 million over the course of her lifetime, but that amount could "easily" double. To illustrate why he was unable to quantify the cost more precisely, Dr. Fried explained plaintiff's needs had changed and would continue to change over time.

For example, Dr. Fried testified when he first treated plaintiff four years prior to trial, she was projected to need two surgeries on her legs in her lifetime. But at the time of trial, plaintiff already underwent two surgeries and, based on her life expectancy, had about fifty or sixty additional years of life. Dr. Fried also opined Karras's projected home health care costs were too conservative because they were based on the presumption she would not need care until age forty – but she required care at the then age of twenty-eight.

Karras testified about the life care plan he formulated for plaintiff after reviewing her medical records and prosthetic needs. He explained, "My job was

to cost out the care that [the physicians] specifically recommended," including plastic surgery, psychology, routine care from orthopedists, pain management, physiatrist care, diagnostic testing, prosthetics, home health care, surgical care, facility care, and transportation.  Karras walked the jury through his summary cost sheet and each category of services and costs.  He ultimately opined the cost for all care services required for the next fifty-two years was $11,885,624.15, which he deemed "a very conservative optimistic number."

To demonstrate plaintiff's limitations and lifestyle, Karras narrated a nineteen minute "day-in-the-life" video for the jury.  Karras corroborated Dr. Fried's testimony that the home care costs will "probably come close to tripling" if care began at age twenty-eight, rather than when plaintiff turns forty.

John Schulte, plaintiff's prosthetics expert, described her amputations and the manner in which a prosthetic is engineered to the specific individual.  He explained plaintiff's prosthetic treatment plan, including five different types of task-oriented devices.  Schulte opined the devices would require replacement every three years.  Citing Karras's life care plan, Schulte testified the cost of plaintiff's prosthetics would total $9.2 million dollars over the course of her lifetime.

A-3943-23

Andrew Verzilli, a forensic economist, testified about the value of plaintiff's lost wages. Citing plaintiff's annual earnings as a supervisor at Peet's Coffee, that is, between $28,000 and $30,000, Verzilli opined plaintiff suffered $1,187,244 in past and future lost wages. Verzilli opined the present value of plaintiff's future medical costs over the next fifty-two years was $7,741,268, and past and future loss of household services was $225,506, for a total present-day value of $9,154,018. Plaintiff's vocational expert, Stephen Gumerman, Ph.D., opined plaintiff "was unemployable on a sustained basis and unable to work" based on the loss of her legs.

## B. Motion for a New Trial or Remittitur

Defendants argue the jury's award on "future medical damages was based on speculation and conjecture," exacerbated by the trial judge's failure to bifurcate plaintiff's liability and damages claims and preclude the photograph and illustration of plaintiff's injuries. They therefore argue the judge erroneously denied their motion for a new trial or remittitur. We are unconvinced.

"[A] motion for a new trial 'should be granted only where to do otherwise would result in a miscarriage of justice shocking to the conscience of the court.'" Risko, 206 N.J. at 521 (quoting Kulbacki v. Sobchinsky, 38 N.J. 435, 456

34 <span>A-3943-23</span>

(1962)). "[I]n the unusual case where a damages award was grossly excessive or grossly inadequate" the court is empowered "to grant a new trial or offer the parties a remittitur or additur." Orientale v. Jennings, 239 N.J. 569, 593 (2019). As the motion judge in the present matter correctly recognized, "unless both parties consent to a remittitur or additur, the court must grant a new trial." Ibid.

Following arguments on defendants' motion, the trial judge issued a thorough oral decision followed by a memorializing order and written statement of reasons. In both decisions, the judge referenced the trial evidence and concluded "the jury's damage award did not shock the judicial conscience." In his oral decision, the judge noted plaintiff "was a young woman in her early twenties, who was devastatingly injured as a result of [defendants'] negligence" and "would live a normal life expectancy but, to put it bluntly, without legs." The judge cited the jury's obligation "to award a damage verdict amount that attempt[ed] to make . . . plaintiff whole."

In his written statement of reasons that followed, the judge elaborated: "Although the jury's award exceeded the amount of [p]laintiff's life care plan reduced to present value, the evidence supports the jury's award. Plaintiff's life-care expert[, Karras,] testified that [p]laintiff's future expenses would be $11,885,624.15, and that number was 'very conservative' and 'optimistic.'" The

judge further noted Karras testified "the life care plan accounted for in-home care beginning at age 40 for [p]laintiff, and did not account for a potential extra 12 years of in-home care that might be necessary." The testimony of plaintiff's experts supports the judge's findings.

Indeed, as Dr. Fried testified, as a bilateral amputee, plaintiff will need the services of a rehabilitation physician for the rest of her life and her prosthetics will cost at least $9.2 million, but that cost could easily double based on variables such as weight change and surgeries. Karras confirmed the total cost of all services was $11,885,624.15. Gumerman testified in light of plaintiff's chronic pain, fatigue and lack of mobility, she was "unemployable on a sustained basis and unable to work." Verzilli testified plaintiff suffered $1,187,244 in lost wages, the present value of her future medical costs over the next fifty-two years would total $7,741,268, and her past and future loss of household services was valued at $225,506, for a total present-day value of $9,154,018.

Correctly recognizing plaintiff's burden to prove damages, the judge reasonably found defendants did not rebut her four experts on future medical expenses. We discern no error in the judge's decision denying defendants' motion for a new trial or, in the alternative, remittitur.

36

## IV. Cumulative Error

Lastly, defendants argue the cumulative effect of trial errors warrants a retrial. In addition to the claims of error we have rejected, defendants further contend the motion judge erroneously denied their application to bifurcate trial on liability and damages, and the trial judge compounded the error by erroneously admitting into evidence the photograph and illustration depicting plaintiff's "horrific and gruesome injuries."

"An appellate court may reverse a trial court's judgment if 'the cumulative effect of small errors [is] so great as to work prejudice,'" rendering the trial unfair. Torres v. Pabon, 225 N.J. 167, 190 (2016) (alteration in original) (quoting Pellicer ex rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 53 (2009)). However, we do not simply count mistakes. Pellicer, 200 N.J. at 55 (recognizing "even a large number of errors, if inconsequential, may not operate to create an injustice"). Accordingly, this theory will not apply "where no error was prejudicial and the trial was fair." State v. Weaver, 219 N.J. 131, 155 (2014); see also State v. R.B., 183 N.J. 308, 334 (2005) (recognizing a defendant in a criminal trial "is entitled to a fair trial but not a perfect one" (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953))).

A-3943-23

## A. Motion to Bifurcate Claims

A trial judge may sever claims "for the convenience of the parties or to avoid prejudice," R. 4:38-2(a), and may direct that "the issues of liability and damages be separately tried" if a trial as to all issues would be "complex and confusing" or separate trials would result in "a substantial saving of time," R. 4:38-2(b). See Lanzo v. Cyprus Amax Minerals Co., 467 N.J. Super. 476, 529 (App. Div. 2021) (describing the balancing analysis to decide severance motions); Tobia v. Cooper Hosp. Univ. Med. Ctr., 136 N.J. 335, 345 (1994) (describing the bases for separate trials).

In his decision denying defendants' application to bifurcate plaintiff's liability and damages claims under Rule 4:38-2(b), the motion judge found the issues were not complex or confusing, judicial economy would not be served by impaneling two juries, and defendants would suffer no undue prejudice in a single trial. In his decision denying defendants' motion for a new trial, the judge echoed the motion judge's reasoning.

We discern no reason to disturb the judges' decisions. See Thompson by Thompson v. Merrell Dow Pharm., Inc., 229 N.J. Super. 230, 255 (App. Div. 1988) (recognizing the discretionary review on bifurcation issues pertaining to liability and damages). Defendants raise no contentions before us that warrant

further discussion.  R. 2:11-3(e)(1)(E).

### B.  Motion to Preclude Photograph and Illustration

Relevant evidence is presumptively admissible under N.J.R.E. 402, but may be found inadmissible under N.J.R.E. 403, "if its probative value is substantially outweighed by the risk of . . . undue prejudice."  See Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 5 on N.J.R.E. 403 (2026) ("Only 'undue' prejudice can justify the exclusion of otherwise admissible evidence.  This qualifier is critical to proper application of N.J.R.E. 403 because all damaging evidence is prejudicial."); Rosenblit v. Zimmerman, 166 N.J. 391, 410 (2001) ("The mere fact that 'evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof.'"  (quoting State v. West, 29 N.J. 327, 335 (1959))).

In his decision denying defendant's application to preclude the photograph and illustration, the trial judge was satisfied plaintiff did not seek to "pile on and . . . overly exhibit the nature and extent of the injuries suffered."  The judge further found "plaintiff [wa]s entitled to have her injury observed by the jury and take[n] into consideration its nature and extent."  Accordingly, the judge found both exhibits were probative as they "illustrate[d] the nature and extent of the injuries alleged."  Notably, although the photograph and medical illustration

were admitted in evidence, plaintiff's counsel only published the medical illustration in open court.

Moreover, in his opening instructions, the trial judge expressly advised the jury of its "duty," that is, "to weigh th[e] evidence calmly, impartially, and without explicit or implicit bias, passion, prejudice, or sympathy, and to decide the issue on the merits." See Model Jury Charges (Civil), 1.11A, "Preliminary Charge" (rev. Sept. 2022). The judge echoed, and expounded upon, the jury's duty in his final instructions. See Model Jury Charges (Civil), 1.12P, "General Provisions for Standard Charge" (rev. Sept. 2022).

We discern no basis to disturb the judge's evidentiary determination. Rowe v. Bell & Gossett Co., 239 N.J. 531, 551 (2019); see also Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (recognizing "a trial court is granted broad discretion to determine both the relevance of the evidence presented and whether its probative value is substantially outweighed by its prejudicial nature"). Again, defendants raise no contentions on appeal of this issue that warrant further discussion. R. 2:11-3(e)(1)(E).

In summary, we reject defendants' contentions that the cumulative effect of the errors committed during the trial warrants reversal. Defendants failed to demonstrate any error or pattern of errors, rising to the level either singly or

cumulatively, denied them a fair trial.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

41                                                                    A-3943-23